UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

PAUL THOMPSON,

     Plaintiff,

                                    Case No.

vs.

TREASURE COAST BULLION GROUP, INC.;
WORTH GROUP, INC.;
MATTHEW JOHN KEHOE; and DOES 1-10
AND ROES 1-10,

     Defendants.

_____/

## DECLARATION OF DAVID LOVE

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.    My name is David Love, I am over 18 years of age, and I am a resident of the State of Florida.  I prepared this declaration to support the Defendants' Motion to Dismiss in the case *Paul Thompson v. Treasure Coast Bullion Group, Inc., Worth Group, Inc., and Matthew John Kehoe.*  I am making these facts based on my personal knowledge, but because this declaration is for a limited purpose, I have not included everything I know about this matter.

2.    As an employee of Treasure Coast Bullion Group, Inc., I am familiar with the Treasure Coast Bullion website and the Worth Group website.  I am also familiar with how customers open accounts using the website.

3.    A potential customer of Treasure Coast Bullion and/or Worth Group can access the company through the website: https://www.metalsedge.com.  On the top right hand portion of

1

the landing page, there is an orange box with the words: "Open an Account."  A copy of the landing page is attached as Exhibit 1.

4.   If a potential customer clicks on this box, the website displays an online customer account application for Treasure Coast Bullion.  Using this application, the potential customer may provide personal information including name, date of birth, address, employment information, social security number, and driver's license number (the potential customer is also required to send a copy of the license before an account is opened).  If the potential customer properly fills in all of the requested information, the potential customer may press a button marked continue at the bottom of the page.  If any information is missing or insufficient, the website will not allow the potential customer to continue unless the issue is fixed.  Copies of the application page are attached as Exhibit 2.  The first portion of Exhibit 2 is a blank application, the second portion is an application with the error message, and the third portion is a fully completed application.

5.   If all of the information is correct on the application page and the potential customer clicks on "Continue," the website will display a Terms and Conditions Section.  This section contains all of the terms of the contract between Treasure Coast Bullion and the potential customer (including the arbitration provision), and the potential customer has the opportunity to scroll through the terms and read them.  At the bottom of the page is an acknowledgment which says in bold:

> **I have carefully read and understand the foregoing. I understand that I am agreeing to submit all disputes, claims and controversies arising out of, or relating to, my transactions with Treasure Coast Bullion Group, Inc. or this Agreement to binding arbitration before JAMS, which is a private dispute resolution procedure, as set forth in Section 14 above. I**

**understand that by agreeing thereto, I am also agreeing to pay JAMS administrative fees and arbitrators fees according to the terms of Subsection 14.d and to give up my rights to a jury trial of any claims. (See Section 14.k)**

6.    The acknowledgment has a box next to it where the potential customer can click to signify that he has carefully read and understands the Terms and Conditions.  If the potential customer clicks on the box and provides an electronic signature, the potential customer may click on a box containing the word "Continue" at the bottom of the page.  If any information is missing or insufficient, the website will not allow the potential customer to continue unless the issue is fixed.  Copies of the Terms and Conditions Section are attached as Exhibit 3.  The first portion of Exhibit 3 is a blank Terms and Conditions page, the second portion is a Terms and Conditions page with the error message, and the third portion is a fully completed Terms and Conditions page.

7.    If all of the information is correct on the Terms and Conditions Section page and the potential customer clicks on "Continue," the website will display an Additional Information and Electronic Signature Addendum.  This section allows the potential customer to select a sales representative, provides information regarding Treasure Coast Bullion's anti-money laundering and privacy policies, and makes the following electronic signature disclosure:

> You hereby consent and agree that your use of a key pad, mouse or other device to select an item, button, icon or similar act/action while using any electronic service we offer; or in accessing or making any transactions regarding any agreement, acknowledgment, consent, terms, disclosures or conditions constitutes your signature, acceptance and agreement as if actually signed by you in writing. Further, you agree that no certification, authority or other third party verification is necessary to validate your electronic signature; and that the lack of such certification or third party verification will not in any way affect the enforceability of

your signature or any resulting contract between you and Treasure Coast Bullion Group, Inc.

By clicking CONTINUE below, I hereby represent that the information provided by me on the Customer Profile section of this packet is true and correct. I further represent that I will notify Treasure Coast Bullion Group, Inc. of any material changes. Treasure Coast Bullion Group, Inc. reserves the right, but has no duty, to verify the accuracy of information provided, and to contact such bankers, brokers and others as it deems necessary.

I acknowledge that this is a legally binding contractual agreement. I have read it carefully, and by submitting this agreement application, I agree to be bound by every term and condition. No modification of this Agreement is valid unless accepted by Treasure Coast Bullion Group, Inc. in writing. I confirm that I have not made any alterations or deletions to this agreement or any such documents from the original forms posted on the website. In the event that there are any alterations or deletions to this agreement or any such documents such alteration and deletions shall not be binding on you and said original forms shall govern Trader account relationship with Treasure Coast Bullion Group, Inc.

8.   At the bottom of the page is another acknowledgement in bold which says the following:

**I hereby warrant that the foregoing answers are true and correct to the best of my knowledge and that I have not been instructed by anyone to misrepresent any fact herein. Treasure Coast Bullion Group, Inc. may rely on the above information in determining whether to buy or sell precious metals from or to me or to extend me any financing.**

9.   If the potential customer clicks on the box next to the acknowledgment and provides an electronic signature, the potential customer may click on a button marked "Finish" at the bottom of the page.   If any information is missing or insufficient, the website will not allow the potential customer to finish unless the issue is fixed.   Copies of the Additional Information and Electronic Signature Addendum are attached as Exhibit 4.   The first portion of Exhibit 4 is a

blank Additional Information and Electronic Signature Addendum, the second portion is a Additional Information and Electronic Signature Addendum with the error message, and the third portion is a fully completed Additional Information and Electronic Signature Addendum.

10.  Once the potential client presses "Finish," the Website causes a confirmation email to be sent to the potential customer's email address.  In addition, the Website generates a Worth Group customer application.

11.  The first section of the Worth Group account documents is a Customer Information Section.  The information for this section is already completed based on the potential customer's prior answers to the Treasure Coast Bullion application.  On the bottom of the page is a button marked "Continue," which the potential customer may use to confirm the information and to move on.  A copy of the completed Customer Information page is attached as Exhibit 5.

12.  If the potential customer clicks on "Continue," the website will display a Loan, Security and Storage Agreement. This section contains all of the terms of the contract between Worth Group and the potential customer (including the arbitration provision). The potential customer customer must scroll through the terms and read them to continue.  In addition, at the bottom of the page is an acknowledgment which says: "I understand the Terms and Conditions."  If the potential customer scrolls through the terms, clicks the box next to this acknowledgment, and provides an electronic signature, the website will advance the potential customer to the next page.  If any information is missing or insufficient, the website will not allow the potential customer to continue unless the issue is fixed.  Copies of the Loan, Security and Storage Agreement are attached as Exhibit 6.  The first portion of Exhibit 6 is a blank Additional Information and Electronic Signature Addendum, the second portion is a Additional Information

and Electronic Signature Addendum with the error message, and the third portion is a fully completed Additional Information and Electronic Signature Addendum.

13. If the potential customer clicks on the acknowledgement, provides an electronic signature, and presses Continue, the website will display an Authorization to Transfer Funds and Additional Information page.

14. This section allows the potential customer to authorize Worth Group to transfer funds between the potential customer's accounts, provides information regarding Worth Group's anti-money laundering and privacy policies, and makes the following electronic signature disclosure:

> You hereby consent and agree that your use of a key pad, mouse or other device to select an item, button, icon or similar act/action while using any electronic service we offer; or in accessing or making any transactions regarding any agreement, acknowledgment, consent, terms, disclosures or conditions constitutes your signature, acceptance and agreement as if actually signed by you in writing. Further, you agree that no certification, authority or other third party verification is necessary to validate your electronic signature; and that the lack of such certification or third party verification will not in any way affect the enforceability of your signature or any resulting contract between you and Worth Group, Inc.

> By clicking CONTINUE below, I hereby represent that the information provided by me on the customer information section of this packet is true and correct. I further represent that I will notify Worth Group, Inc of any material changes. Worth Group, Inc reserves the right, but has no duty, to verify the accuracy of information provided, and to contact such bankers, brokers and others as it deems necessary.
> I acknowledge that this is a legally binding contractual agreement. I have read it carefully, and by submitting this agreement application, I agree to be bound by every term and condition. No modification of this Agreement is valid unless accepted by Worth Group, Inc in writing. I confirm that I have not made any alterations or deletions to this agreement or any such documents from the original forms posted on the website. In the event that there are any alterations or deletions to this agreement or any such documents such alteration and deletions shall not

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  3313 Tel. (305) 361.5500, Fax (305) 428.9532

be binding on you and said original forms shall govern Trader account relationship with Worth Group, Inc.

15. At the bottom of the page is another acknowledgement in bold which says the following:

> **I hereby warrant that the foregoing answers are true and correct to the best of my knowledge and that I have not been instructed by anyone to misrepresent any fact herein. Worth Group, Inc. may rely on the above information in determining whether to extend me credit.**

16.   If the potential customer clicks on the box next to the acknowledgment and provides an electronic signature, the website allows the potential customer to advance to an Instruction Letter.   If any information is missing or insufficient, the website will not allow the potential customer to continue unless the issue is fixed.   Copies of the Authorization to Transfer Funds and Additional Information page are attached as Exhibit 7.   The first portion of Exhibit 7 is a blank Authorization to Transfer Funds and Additional Information page, the second portion is a Authorization to Transfer Funds and Additional Information page with the error message, and the third portion is a fully completed Authorization to Transfer Funds and Additional Information page.

17. The Instruction Letter deals with the handling of the potential customer's collateral if Worth sells the potential customer's loan.  At the bottom of this letter, the following Electronic Signature Addendum appears:

> You hereby consent and agree that your use of a key pad, mouse or other device to select an item, button, icon or similar act/action while using any electronic service we offer; or in accessing or making any transactions regarding any agreement, acknowledgment, consent, terms, disclosures or conditions constitutes your signature, acceptance and agreement as if actually signed by you in writing. Further, you agree that no certification, authority or other third party verification is necessary to validate your electronic signature; and that the lack of such certification or third party verification

7

will not in any way affect the enforceability of your signature or any resulting contract between you and Worth Group, Inc.

I have read the foregoing Instruction Letter & Account Addendum carefully, and by clicking AGREE & CONTINUE below, I agree to be bound by every term and condition. I confirm that I have not made any alterations or deletions to this agreement or any such documents from the original forms posted on the website. In the event that there are any alterations or deletions to this agreement or any such documents such alteration and deletions shall not be binding on you and said original forms shall govern Trader account relationship with Worth Group, Inc.

18. After this addendum, there is an acknowledgement which says: "I have read and understand the foregoing Instruction Letter and Account Addendum related to investing in precious metal investments with Worth Group, Inc."  If the potential customer clicks on the button next to the acknowledgment and provides an electronic signature, the potential customer can activate a button on the bottom of the page which says; "Agree and Continue." If any information is missing or insufficient, the website will not allow the potential customer to continue unless the issue is fixed.   Copies of the Instruction Letter are attached as Exhibit 8. The first portion of Exhibit 8 is a blank Additional Information and Electronic Signature Addendum, the second portion is an Instruction Letter with the error message, and the third portion is a fully completed Instruction Letter.

19. If the potential customer successfully activates the Agree and Continue button, the website provides the following message:

> Thank You
> Your application was received successfully. An account representative will be in touch shortly.
> You should also be receiving a copy of your completed application to the email address you provided.
> Thank you, Worth Group, Inc

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  3313 Tel. (305) 361.5500, Fax (305) 428.9532

20. Treasure Coast Bullion and Worth Group each receive a copy of the fully completed application with an electronic signature and an electronic stamp which indicates the URL that the potential customer employed when filling out the application.

21. Exhibit 9 is a copy of Paul Thompson's executed Treasure Coast Bullion contract.   I have checked the URL associated with the signature, and it signifies the account was opened from Las Vegas, Nevada.

22. Exhibit 10 is a copy of Paul Thompson's executed Worth Group contract.   I have checked the URL associated with the signature, and it signifies the account was opened from Las Vegas, Nevada.

23. Exhibit 11 is a copy of Paul Thompson's driver's license which he provided as part of the application process.

24. Matthew John Kehoe is an employee of Treasure Coast Bullion, Inc., and he was an employee during all of the time that Mr. Thompson had his accounts with Treasure Coast Bullion and Worth Group.

25. I declare under penalty of perjury, that the foregoing is true and correct.


Executed on this 18th day of September , 2018.

David Love

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  3313 Tel. (305) 361.5500, Fax (305) 428.9532

# Exhibit 1



(https://www.metalsedge.com/)

(https://www.linkedin.com/company/treasure-coast-bullion-group) (https://www.facebook.com/TreasureCoastBullion/group)

Call Now **1-800-982-6105**(tel:1-800-982-6105)

✏ OPEN ACCOUNT(/OPENACCOUNT)    👤 ACCOUNT LOGIN(/ACCOUNTLOGIN.ASPX)

HOME(HTTPS://WWW.METALSEDGE.COM/)    PRODUCTS(HTTPS://WWW.METALSEDGE.COM/PRODUCTS)

SERVICES(HTTPS://WWW.METALSEDGE.COM/SERVICES)    ABOUT US(HTTPS://WWW.METALSEDGE.COM/ABOUT-US)

MARKET NEWS(HTTPS://WWW.METALSEDGE.COM/NEWS)    CONTACT US(HTTPS://WWW.METALSEDGE.COM/CONTACT-US)

‹ New To Precious Metals Investing? Read The
# BEGINNER'S GUIDE TO PRECIOUS METALS INVESTING.
Many of our visitors are new to precious metal investing. Our Beginner's Guide to Precious Metals will help educate you on the benefits of investing in gold and silver. Our easy to read guide will help you understand your options for owning gold and silver and answer some of the most commonly asked questions - Get your FREE Investor Kit today ›

GET YOUR FREE GUIDE NOW(/INVESTMENT-KIT-REQUEST)



**Gold** 1,202.85 ▲ 9.14    **Silver** 14.22 ▲ 0.16    **Platinum** 803.00 ▲ 7.50    **Palladium** 985.50 ▲ 5.50



(/Products)



(/Services)



(/MarketNews/MarketData)

## GET YOUR <u>FREE</u> INVESTMENT KIT

## SUBSCRIBE TO OUR NEWSLETTER



(http://bit.ly/2srMIEA) Let's keep in touch! Subscribe to our mailing list and receive timely market news, helpful investing tips, as well as, product giveaways and promotions.

SIGN UP(HTTP://BIT.LY/2SRMLEA)



To receive your free kit please fill out the following form.

*All form fields are required*

First Name

Last Name

Phone

Email

☑ Sign up for TCBG Newsletter

SUBMIT

Privacy Policy(/privacy.aspx)

**CURRENT SPOT PRICES**

|  | Bid | Ask | Change |
|---|---|---|---|
| Gold | 1,202.59 | 1,203.04 | ▲ 9.12 (0.76%) |
| Silver | 14.20 | 14.24 | ▲ 0.16 (1.14%) |
| Platinum | 801.00 | 806.00 | ▲ 8.00 (1.01%) |
| Palladium | 980.00 | 991.00 | ▲ 5.50 (0.56%) |

Last Updated: 9/17/2018 12:40:22 PM (EST)

(/Market-News/Market-Data?sourceMedium=sitebanner)



(/Market-News/Market-Data?sourceMedium=sitebanner)



(/Portals/0/Banners/departmentflorida.jpg)

## FEATURED GOLD COIN & BULLION PRODUCTS

   

(https://www.metalsedge.com/Product-Details/gold-american-buffalo-gold-coins-3/rvdsfcatid/gold-coins-4/Default.aspx)

(https://www.metalsedge.com/Product-Details/american-gold-eagle-4/rvdsfcatid/gold-coins-4/Default.aspx)

(https://www.metalsedge.com/Product-Details/suisse-gold-bars-2/rvdsfcatid/gold-bars-3/Default.aspx)

(https://www.metalsedge.com/Product-Details/gold-maple-leaf-coins-10/rvdsfcatid/gold-coins-4/Default.aspx)

## FEATURED SILVER COIN & BULLION PRODUCTS

   

(https://www.metalsedge.com/Product-Details/humpback-whale-silver-coin-16/)

(https://www.metalsedge.com/Product-Details/suisse-gold-bars-2/rvdsfcatid/gold-bars-3/Default.aspx)

(https://www.metalsedge.com/Product-Details/...)

(https://www.metalsedge.com/Product-Details/...)

**2016 SILVER HUMPBACK**

**JOHNSON MATTHEY SILVER BARS**

**SUNSHINE MINTING SILVER BARS**

## LATEST NEWS



**Investing in Precious Metals(https://www.metalsedge.com/News/investing-in-precious-metals)**

**13 SEP 2018**

Precious metals are precious because they are rare. There is a limited amount of these minerals produced each year, and scarcity is the reason for their value. The three major precious metals that trade on futures exchanges around the world are gold, silver, and platinum.



(https://www.metalsedge.com/News/china-to-be-key-player-in-global-silver-market)

**China To Be Key Player In Global Silver Market(https://www.metalsedge.com/News/china-to-be-key-player-in-global-silver-market)**



(https://www.metalsedge.com/News/disaster-is-inevitable-when-americas-stock-market-bubble-bursts)

**Disaster Is Inevitable When America's Stock Market Bubble Bursts(https://www.metalsedge.com/News...**

Silver will play an important role in the global silver market for years to come, both as an industrial user and a silver miner, said the Silver Institute in a report released Wednesday.   The report, titled "Prospects for the Chinese Silver Market," was released at the 17th China International Silver Conference in Shenzhen. The report was researched and...

September 13, 2018          0 Comments

### is-inevitable-when-americas-stock-market-bubble-bursts)

Despite the volatility and brief correction earlier this year, the U.S. stock market is back to making record highs in the past couple weeks. To many observers, this market now seems downright bulletproof as it keeps going higher and higher as it has for nearly a decade in direct defiance of the naysayers' warnings. Unfortunately, this unusual market strength is...

September 6, 2018          0 Comments

LOAD NEXT 3 ARTICLE(S) (340 LEFT)

HOME(HTTPS://WWW.METALSEDGE.COM/)



**Products**

- All Products(/Products)
- Gold(/Products/Gold)
- Silver(/Products/Silver)
- Platinum(/Products/Platinum)
- Market Data(/Market-News/Market-Data)

**Company**

- About Us(http://www.metalsedge.com/AboutUs.aspx)
- TCBG Brochure(http://www.metalsedge.com/TCBG_Brochure.pdf)
- Our Partners(/About-US/Our-Partners)
- Market Fundamentals(/Investment-Kit)
- Privacy Statement (http://www.metalsedge.com/Privacy)

**Customer Support**

- Open an Account(http://www.metalsedge.com/manage-option)
- Account Login(/AccountLogin#)
- Investment Kit(/investment-kit-request)
- Newsletter Signup (https://visitor.r20.constantcontact.com/manage/optin?v=001fmMF3cdXhuk881D-0dL5t7TqTqhALGYy89dqjY480hzoz1Y79badIQ9EpqKvssjQIbkHi8kSEk%3D)
- Contact Us(http://www.metalsedge.com/ContactUs.aspx)

**Contact Us**

Treasure Coast Bullion Group, Inc.
900 E. Military Trail #Ste. 500
Jupiter, FL 33458

11835 W. Olympic Blvd. #Ste. 500
Los Angeles, CA 90064

1-800-982-6105 TOLL-FREE
561-515-2681 FAX


(https://www.facebook.com/TreasureCoastBulli


(https://www.linkedin.com/company/22303671


(https://twitter.com/TCBullion)


(https://www.pinterest.com/treasurecoastbulli

(https://www.instagram.com/treasurecoastbulli

(/News)

LIVE CHAT
Offline

**Risk Disclosure:** Purchasing Gold, Silver, Platinum or any precious metals in bullion, bars, coins, rounds involve a degree of risk that should be carefully evaluated prior to investing any funds. Treasure Coast Bullion Group strongly recommends reading our **Risk Disclosure(http://www.metalsedge.com/Products/PreciousMetalsRiskDisclosure.aspx)** and conducting due diligence before committing any money to purchase gold, silver, and other precious metals. If you have any additional questions, please contact (http://www.metalsedge.com/ContactUs.aspx)Treasure Coast Bullion Group.








COPYRIGHT 2018 BY TREASURE COAST BULLION GROUP, INC.
Privacy Statement(https://www.metalsedge.com/Privacy)
Terms Of Use(https://www.metalsedge.com/Terms)
Login(https://www.metalsedge.com/Login?returnurl=%2f)

Exhibit 2

(viewapp_WM.aspx?DF=true&ID=0&viewBlank=1)

①          ②          ③          ④
Customer Profile    Terms & Conditions    Additional Information    Finished

## I. CUSTOMER PROFILE

IMPORTANT: Please complete this entire application form; answer all questions.

### CUSTOMER IDENTIFICATION

**\*Account Type**
Single Owner

**\*Customer Name**
John Tester

**\*Date of Birth**
11 / 11 / 1999

**Marital Status**
Single

**\* Social Security Number**
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
(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)

**\*Driver's License No., Passport or Alien ID Card**
111111111111

*PLEASE PROVIDE PHOTOCOPY OR ELECTRONIC SCAN OF SUCH ID*

### EMPLOYMENT DETAILS

**Employer Name**
Acme Corp.

**Position**
Clerk

**Employer Phone**
111-111-1111

**Years Employed**
12

### CONTACT DETAILS

**\*Home Phone**
111-111-1111

**Cell Phone**
111-111-1111

**Fax Number**
111-111-1111

**\*Email Address**
info@binhaklaw.com

**\*Country**
United States

**\*Address Line 1**
123 Main Street

**Address Line 2**

**\*City / Town**
NY

**\*State / Province / Region**
New York

**\*Postal Code**
20001

**Residency**
⦿ US Citizen    ◯ Non Resident Alien    ◯ Resident Alien

**Nationality**

CONTINUE    CANCEL

🔒 *For your security: fe80::c535:d759:c06d:96bd%6*

(viewapp_WM.aspx?DF=true&ID=0&viewBlank=1)

① Customer Profile   ② Terms & Conditions   ③ Additional Information   ④ Finished

## I. CUSTOMER PROFILE

IMPORTANT: Please complete this entire application form; answer all questions.

### CUSTOMER IDENTIFICATION

**\*Account Type   (required)**

--Select Account Type--

**\*Customer Name   (required)**

**\*Date of Birth   (required)**        Marital Status

MM  /  DD  /

YYYY

**\* Social Security Number   (required)**

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

(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)

**\*Driver's License No., Passport or Alien ID Card   (required)**

*PLEASE PROVIDE PHOTOCOPY OR ELECTRONIC SCAN OF SUCH ID*

### EMPLOYMENT DETAILS

**Employer Name**                Position

**Employer Phone**              Years Employed

i.e. 999-999-9999

### CONTACT DETAILS

**\*Home Phone   (required)**    Cell Phone    Fax Number

i.e. 999-999-9999    i.e. 999-999-9999    i.e. 999-999-9999

**\*Email Address   (required)**

**\*Country   (required)**

--SELECT COUNTRY--

**\*Address Line 1   (required)**

Address Line 2

**\*City / Town   (required)**   **\*State / Province / Region**   **\*Postal Code   (required)**

**Residency**

◉ US Citizen    ○ Non Resident Alien    ○ Resident Alien

**Nationality**

CONTINUE    CANCEL

🔒 *For your security: fe80::c535:d759:c06d:96bd%6*

(viewapp_WM.aspx?DF=true&ID=0&viewBlank=1)

| (1) | (2) | (3) | (4) |
|---|---|---|---|
| Customer Profile | Terms & Conditions | Additional Information | Finished |

## I. CUSTOMER PROFILE

IMPORTANT: Please complete this entire application form; answer all questions.

### CUSTOMER IDENTIFICATION

**\*Account Type**
Single Owner

**\*Customer Name**
John Tester

**\*Date of Birth**
11 / 11 / 1999

**Marital Status**
Single

**\* Social Security Number**
111-11-111
(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)

**\*Driver's License No., Passport or Alien ID Card**
2222222

*PLEASE PROVIDE PHOTOCOPY OR ELECTRONIC SCAN OF SUCH ID*

### EMPLOYMENT DETAILS

**Employer Name**
Acme Corp.

**Position**
clerk

**Employer Phone**
123-123-1234

**Years Employed**
2001-2011

### CONTACT DETAILS

**\*Home Phone**
123-123-1234

**Cell Phone**
123-123-1234

**Fax Number**
123-123-1234

**\*Email Address**
info@binhaklaw.com

**\*Country**
United States

**\*Address Line 1**
123 Main Street

**Address Line 2**

**\*City / Town**
NY

**\*State / Province / Region**
New York

**\*Postal Code**
20001

**Residency**
( • ) US Citizen     ( ) Non Resident Alien     ( ) Resident Alien

**Nationality**

---

CONTINUE     CANCEL

🔒 *For your security: fe80::c535:d759:c06d:96bd%6*

Exhibit 3

① Customer Profile   ② Terms & Conditions   ③ Additional Information   ④ Finished

## II. Terms and Conditions

### Account Agreement

1.   **Parties.** This Agreement is entered into between Treasure Coast Bullion Group, Inc. ("TREASURE COAST") and the Customer ("Customer" or "you") signing below.

2.   **Purpose of Agreement.** This Agreement provides for the establishment of an account with TREASURE COAST for the purchase and sale of precious metals (sometimes referred to as "precious metals," "coins," "products" or "goods") and shall apply to all such transactions between you and TREASURE COAST. You represent that all of your transactions with TREASURE COAST shall be for investment or other commercial purposes and not for any personal, family or household purposes.

3.   **Risks and Obligations.**

3.1   **Acknowledgment of Risk.** Because of the volatile nature of the precious metals markets, the purchase and sale of precious metals involve a high degree of risk and are not suitable for all persons.

3.2   **Your Rights, Obligations and Risks.** It is important that you read and understand this Agreement, particularly your rights, obligations and risks hereunder. It is also important that you seek the advice of your attorney if you do not have these understandings. By signing this Agreement, you represent that you have read and understand the Agreement and have consulted with your attorney, as necessary, to achieve such understanding.

4.   **Transactions and Role of TREASURE COAST.**

4.1   **Types of Transactions.** Your transactions with TREASURE COAST are either fully paid for at inception or financed with Worth Group, Inc. All transactions you finance with Worth Group involve delivery within at most 28 days of the date of purchase. See Section 7. As a result they are not regulated by the Commodity Futures Trading Commission or the National Futures Association.

4.2   **Role of TREASURE COAST.** TREASURE COAST acts as a principal and as such sells to and buys from

**ACKNOWLEDGEMENT**

☐ **I have carefully read and understand the foregoing. I understand that I am agreeing to submit all disputes, claims and controversies arising out of, or relating to, my transactions with Treasure Coast Bullion Group, Inc. or this Agreement to binding arbitration before JAMS, which is a private dispute resolution procedure, as set forth in Section 14 above. I understand that by agreeing thereto, I am also agreeing to pay JAMS administrative fees and arbitrators fees according to the terms of Subsection 14.d and to give up my rights to a jury trial of any claims. (See Section 14.k)**

| Electronic Signature | Date |
|---|---|
|  | 09/17/2018 |

CONTINUE      BACK



1 **Customer Profile**   2 **Terms & Conditions**   3 **Additional Information**   4 **Finished**

## II. Terms and Conditions

### Account Agreement

1. **Parties.** This Agreement is entered into between Treasure Coast Bullion Group, Inc. ("TREASURE COAST") and the Customer ("Customer" or "you") signing below.

2. **Purpose of Agreement.** This Agreement provides for the establishment of an account with TREASURE COAST for the purchase and sale of precious metals (sometimes referred to as "precious metals," "coins," "products" or "goods") and shall apply to all such transactions between you and TREASURE COAST. You represent that all of your transactions with TREASURE COAST shall be for investment or other commercial purposes and not for any personal, family or household purposes.

3. **Risks and Obligations.**

3.1 **Acknowledgment of Risk.** Because of the volatile nature of the precious metals markets, the purchase and sale of precious metals involve a high degree of risk and are not suitable for all persons.

3.2 **Your Rights, Obligations and Risks.** It is important that you read and understand this Agreement, particularly your rights, obligations and risks hereunder. It is also important that you seek the advice of your attorney if you do not have these understandings. By signing this Agreement, you represent that you have read and understand the Agreement and have consulted with your attorney, as necessary, to achieve such understanding.

4. **Transactions and Role of TREASURE COAST.**

4.1 **Types of Transactions.** Your transactions with TREASURE COAST are either fully paid for at inception or financed with Worth Group, Inc. All transactions you finance with Worth Group involve delivery within at most 28 days of the date of purchase. See Section 7. As a result they are not regulated by the Commodity Futures Trading Commission or the National Futures Association.

4.2 **Role of TREASURE COAST.** TREASURE COAST acts as a principal and as such sells to and buys from

**ACKNOWLEDGEMENT**

☐ **I have carefully read and understand the foregoing. I understand that I am agreeing to submit all disputes, claims and controversies arising out of, or relating to, my transactions with Treasure Coast Bullion Group, Inc. or this Agreement to binding arbitration before JAMS, which is a private dispute resolution procedure, as set forth in Section 14 above. I understand that by agreeing thereto, I am also agreeing to pay JAMS administrative fees and arbitrators fees according to the terms of Subsection 14.d and to give up my rights to a jury trial of any claims. (See Section 14.k)**

**Electronic Signature   (required)**   **Date**

| | |
|---|---|
| | 09/17/2018 |

CONTINUE   BACK





| 1 | 2 | 3 | 4 |
|---|---|---|---|
| Customer Profile | Terms & Conditions | Additional Information | Finished |

## II. Terms and Conditions

otherwise provided for in this Agreement. The selection and replacement of an arbitrator or arbitrators shall be in accordance with the JAMS Rules, except that: (i) each arbitrator shall be a retired judge of either the Florida Circuit Court] or a United States District Court located in Florida, and (ii) any party may require a panel of three neutral arbitrators.

    f.  **Decision of the Arbitrator(s).** Subject only to a party's right to a JAMS appeal under Subsection 14.g. below, the arbitration shall be final, conclusive and binding on the parties and the award of the arbitrator(s) shall be enforceable in any court of competent jurisdiction.

    g.  Right to Appeal. A final decision by one arbitrator may be appealed to JAMS by any party. A final decision by a three- arbitrator panel is final and may not be appealed. Appeals to JAMS shall be subject to the following rules and procedures:

        1.  The appeal panel will consist of three neutral arbitrators selected in the same manner and subject to the same requirements as under Subsection 14.e. above.

        2.  The procedure for filing and arguing an appeal is as follows:

            i.  Any party may appeal a final arbitration award issued by one arbitrator. The appeal must be served, in writing, on JAMS and on the opposing party within 14 calendar days after the award becomes final. The appealing party must specify in writing those parts of the award being appealed and must contain a brief statement of the appeal.

           ii.  Within seven calendar days of the service of the appeal, the opposing party may serve on JAMS and on the opposing party a cross-appeal from any part of the award. The written cross-appeal must specify those parts of the award that the party is cross appealing and must contain a brief statement of the basis for the cross-appeal.

          iii.  The record on appeal will consist of the stenographic or other record of the arbitration hearing and all exhibits, deposition transcripts and affidavits that the arbitrator has accepted into the record. The parties will cooperate with JAMS in compiling the appellate record. No evidence not

**ACKNOWLEDGEMENT**

☑ **I have carefully read and understand the foregoing. I understand that I am agreeing to submit all disputes, claims and controversies arising out of, or relating to, my transactions with Treasure Coast Bullion Group, Inc. or this Agreement to binding arbitration before JAMS, which is a private dispute resolution procedure, as set forth in Section 14 above. I understand that by agreeing thereto, I am also agreeing to pay JAMS administrative fees and arbitrators fees according to the terms of Subsection 14.d and to give up my rights to a jury trial of any claims. (See Section 14.k)**

**Electronic Signature**

John Tester

**Date**

09/17/2018

CONTINUE        BACK



*For your security: fe80::c535:d759:c06d:96bd%6*

Exhibit 4

| ① | ② | ③ | ④ |
|---|---|---|---|
| Customer Profile | Terms & Conditions | Additional Information | Finished |

## III. ADDITIONAL INFORMATION AND ELECTRONIC SIGNATURE ADDENDUM

**You are not obligated to pay any monies unless you sign this contract and return it to the commercial telephone seller.**

| Company TC#: | Salesman TP#: | Salesman Name: |
|---|---|---|
| 4455 | | -Select Salesman- ▲▼ |

### ADDITIONAL INFORMATION

**AML POLICY:** To comply with Federal ANTI MONEY LAUNDERING laws, we ask that you provide us at the time you open your account with a current government-issued photo-bearing identification with current residential address (e.g., driver's license, passport, state or national identity card). If you are a corporation, partnership, limited liability company or trust, we ask that you provide us with a certified copy of your articles or certificate of incorporation or organization or partnership or trust agreement, as appropriate, and a certificate of good standing or active status issued by the jurisdiction of formation or incorporation. We also ask that you complete the attached one page form.

**PRIVACY POLICY:** Maintaining the privacy of your personal information is of the utmost importance to us. In order to provide services to you, we must maintain certain information that we collect from account applications or other forms that you complete, transactions that you conduct and communications with our affiliates and us. It is our policy not to disclose your personal information to third parties except as permitted by law or requested by you. We also restrict access to nonpublic personal information to those employees who need to know that information to provide service to you. You are welcome to contact us at 1-800-982-6105 if you have any questions regarding our Privacy Policy. We reserve the right to revise our policy and will provide you notice of any revisions.

**If you have any questions please contact us at 1-800-982-6105**

### ELECTRONIC SIGNATURE ADDENDUM

You hereby consent and agree that your use of a key pad, mouse or other device to select an item, button, icon or similar act/action while using any electronic service we offer; or in accessing or making any transactions regarding any agreement, acknowledgment, consent, terms, disclosures or conditions constitutes your signature, acceptance and agreement as if actually signed by you in writing. Further, you agree that no certification, authority or other third party verification is necessary to validate your electronic signature; and that the lack of such certification or third party verification will not in any way affect the enforceability of your signature or any resulting contract between you and Treasure Coast Bullion Group, Inc..

By clicking CONTINUE below, I hereby represent that the information provided by me on the Customer Profile section of this packet is true and correct. I further represent that I will notify Treasure Coast Bullion Group, Inc. of any material changes. Treasure Coast Bullion Group, Inc. reserves the right, but has no duty, to verify the accuracy of information provided, and to contact such bankers, brokers and others as it deems necessary.

I acknowledge that this is a legally binding contractual agreement. I have read it carefully, and by submitting this agreement application, I agree to be bound by every term and condition. No modification of this Agreement is valid unless accepted by Treasure Coast Bullion Group, Inc. in writing. I confirm that I have not made any alterations or deletions to this agreement or any such documents from the original forms posted on the website. In the event that

there are any alterations or deletions to this agreement or any such documents such alteration and deletions shall not be binding on you and said original forms shall govern Trader account relationship with Treasure Coast Bullion Group, Inc..

☐ **I hereby warrant that the foregoing answers are true and correct to the best of my knowledge and that I have not been instructed by anyone to misrepresent any fact herein. Treasure Coast Bullion Group, Inc. may rely on the above information in determining whether to buy or sell precious metals from or to me or to extend me any financing.**

**Electronic Signature**

**Date**

09/17/2018

FINISH          BACK

🔒 *For your security: fe80::c535:d759:c06d:96bd%6*

| ① | ② | ③ | ④ |
|---|---|---|---|
| Customer Profile | Terms & Conditions | Additional Information | Finished |

## III. ADDITIONAL INFORMATION AND ELECTRONIC SIGNATURE ADDENDUM

**You are not obligated to pay any monies unless you sign this contract and return it to the commercial telephone seller.**

| Company TC#: | Salesman TP#: | Salesman Name: |
|---|---|---|
| 4455 | | -Select Salesman- ⬍ |

### ADDITIONAL INFORMATION

**AML POLICY:** To comply with Federal ANTI MONEY LAUNDERING laws, we ask that you provide us at the time you open your account with a current government-issued photo-bearing identification with current residential address (e.g., driver's license, passport, state or national identity card). If you are a corporation, partnership, limited liability company or trust, we ask that you provide us with a certified copy of your articles or certificate of incorporation or organization or partnership or trust agreement, as appropriate, and a certificate of good standing or active status issued by the jurisdiction of formation or incorporation. We also ask that you complete the attached one page form.

**PRIVACY POLICY:** Maintaining the privacy of your personal information is of the utmost importance to us. In order to provide services to you, we must maintain certain information that we collect from account applications or other forms that you complete, transactions that you conduct and communications with our affiliates and us. It is our policy not to disclose your personal information to third parties except as permitted by law or requested by you. We also restrict access to nonpublic personal information to those employees who need to know that information to provide service to you. You are welcome to contact us at 1-800-982-6105 if you have any questions regarding our Privacy Policy. We reserve the right to revise our policy and will provide you notice of any revisions.

**If you have any questions please contact us at 1-800-982-6105**

### ELECTRONIC SIGNATURE ADDENDUM

You hereby consent and agree that your use of a key pad, mouse or other device to select an item, button, icon or similar act/action while using any electronic service we offer; or in accessing or making any transactions regarding any agreement, acknowledgment, consent, terms, disclosures or conditions constitutes your signature, acceptance and agreement as if actually signed by you in writing. Further, you agree that no certification, authority or other third party verification is necessary to validate your electronic signature; and that the lack of such certification or third party verification will not in any way affect the enforceability of your signature or any resulting contract between you and Treasure Coast Bullion Group, Inc..

By clicking CONTINUE below, I hereby represent that the information provided by me on the Customer Profile section of this packet is true and correct. I further represent that I will notify Treasure Coast Bullion Group, Inc. of any material changes. Treasure Coast Bullion Group, Inc. reserves the right, but has no duty, to verify the accuracy of information provided, and to contact such bankers, brokers and others as it deems necessary.

I acknowledge that this is a legally binding contractual agreement. I have read it carefully, and by submitting this agreement application, I agree to be bound by every term and condition. No modification of this Agreement is valid unless accepted by Treasure Coast Bullion Group, Inc. in writing. I confirm that I have not made any alterations or deletions to this agreement or any such documents from the original forms posted on the website. In the event that

there are any alterations or deletions to this agreement or any such documents such alteration and deletions shall not be binding on you and said original forms shall govern Trader account relationship with Treasure Coast Bullion Group, Inc..

☐ **I hereby warrant that the foregoing answers are true and correct to the best of my knowledge and that I have not been instructed by anyone to misrepresent any fact herein. Treasure Coast Bullion Group, Inc. may rely on the above information in determining whether to buy or sell precious metals from or to me or to extend me any financing.**

**Electronic Signature   (required)**      Date

|  |
|---|

09/17/2018

FINISH          BACK

*For your security: fe80::c535:d759:c06d:96bd%6*

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| Customer Profile | Terms & Conditions | Additional Information | Finished |

## III. ADDITIONAL INFORMATION AND ELECTRONIC SIGNATURE ADDENDUM

**You are not obligated to pay any monies unless you sign this contract and return it to the commercial telephone seller.**

| Company TC#: | Salesman TP#: | Salesman Name: |
|---|---|---|
| 4455 | | -Select Salesman- ⬍ |

### ADDITIONAL INFORMATION

**AML POLICY:** To comply with Federal ANTI MONEY LAUNDERING laws, we ask that you provide us at the time you open your account with a current government-issued photo-bearing identification with current residential address (e.g., driver's license, passport, state or national identity card). If you are a corporation, partnership, limited liability company or trust, we ask that you provide us with a certified copy of your articles or certificate of incorporation or organization or partnership or trust agreement, as appropriate, and a certificate of good standing or active status issued by the jurisdiction of formation or incorporation. We also ask that you complete the attached one page form.

**PRIVACY POLICY:** Maintaining the privacy of your personal information is of the utmost importance to us. In order to provide services to you, we must maintain certain information that we collect from account applications or other forms that you complete, transactions that you conduct and communications with our affiliates and us. It is our policy not to disclose your personal information to third parties except as permitted by law or requested by you. We also restrict access to nonpublic personal information to those employees who need to know that information to provide service to you. You are welcome to contact us at 1-800-982-6105 if you have any questions regarding our Privacy Policy. We reserve the right to revise our policy and will provide you notice of any revisions.

**If you have any questions please contact us at 1-800-982-6105**

### ELECTRONIC SIGNATURE ADDENDUM

You hereby consent and agree that your use of a key pad, mouse or other device to select an item, button, icon or similar act/action while using any electronic service we offer; or in accessing or making any transactions regarding any agreement, acknowledgment, consent, terms, disclosures or conditions constitutes your signature, acceptance and agreement as if actually signed by you in writing. Further, you agree that no certification, authority or other third party verification is necessary to validate your electronic signature; and that the lack of such certification or third party verification will not in any way affect the enforceability of your signature or any resulting contract between you and Treasure Coast Bullion Group, Inc..

By clicking CONTINUE below, I hereby represent that the information provided by me on the Customer Profile section of this packet is true and correct. I further represent that I will notify Treasure Coast Bullion Group, Inc. of any material changes. Treasure Coast Bullion Group, Inc. reserves the right, but has no duty, to verify the accuracy of information provided, and to contact such bankers, brokers and others as it deems necessary.

I acknowledge that this is a legally binding contractual agreement. I have read it carefully, and by submitting this agreement application, I agree to be bound by every term and condition. No modification of this Agreement is valid unless accepted by Treasure Coast Bullion Group, Inc. in writing. I confirm that I have not made any alterations or deletions to this agreement or any such documents from the original forms posted on the website. In the event that

there are any alterations or deletions to this agreement or any such documents such alteration and deletions shall not be binding on you and said original forms shall govern Trader account relationship with Treasure Coast Bullion Group, Inc..

☐ **I hereby warrant that the foregoing answers are true and correct to the best of my knowledge and that I have not been instructed by anyone to misrepresent any fact herein. Treasure Coast Bullion Group, Inc. may rely on the above information in determining whether to buy or sell precious metals from or to me or to extend me any financing.**

| Electronic Signature | Date |
|---|---|
| John Tester | 09/17/2018 |

FINISH     BACK

 *For your security: fe80::c535:d759:c06d:96bd%6*

Exhibit 5

**Worth**Group

| Current Prices | Gold **1203.20 (+9.50)** USD | Silver **14.21 (+0.15)** USD | Platinum **804.50 (+9.00)** USD | Palladium **986.00 (+6.00)** USD |

## CUSTOMER ACCOUNT DOCUMENTATION

I.  Customer Information
II.  Loan, Security and Storage Agreement
III. Authorization to Transfer Funds and Additional Information
IV. Instruction Letter

IMPORTANT: Please complete this entire application form; answer all questions.

### I. Customer Information

*This form was auto-populated from a previous step. Please confirm the information provided.*

*Account Type:
- ○ Single Owner
- ○ Limited Liability Company
- ○ Joint Tenants with Right of Survivorship
- ○ Trustee For (Name of Trust, Pension or Profit Sharing Plan)
- ○ Tenants in Common
- ○ Corporation
- ○ Partnership

*Borrower Name: John Tester

Co-Signer Name:

*Street Address: 123 Main Street          Apt. Number:

*City: NY     *State: New York     *Zip: 20001     Country: United States

Residency: ● US Citizen     ○ Non Resident Alien     ○ Resident Alien

Nationality:

*Driver's License No., Passport or Alien ID Card: 22222222

*Co-Signer Driver's License No., Passport or Alien ID Card:

PLEASE PROVIDE PHOTOCOPY OR ELECTRONIC SCAN OF SUCH ID

Employer's Name: Acme Corp

Position: clerk

Business Telephone: 123-123-1234          Years Employed: 2001-2011

*Home Telephone: 123-123-1234          Cell Phone: 123-123-1234

*Email Address: info@binhaklaw.com          Fax Number: 123-123-1234

*Date of Birth 11/11/1999 (MM/DD/YYYY)          Co-Signer DOB: MM/DD/YYYY

*Primary SSN: 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 (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)          Co-Signer SSN: (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)

[ Continue ]    [ Cancel ]

**Worth**Group

Home     Products     Quotes & Charts     Wholesale     Forms     IRAs     Contact

Exhibit 6



| | Current Prices | Gold **1203.30 (+9.60)** USD | Silver **14.21 (+0.15)** USD | Platinum **805.00 (+9.50)** USD | Palladium **986.00 (+6.00)** USD |
|---|---|---|---|---|---|



## II. Loan, Security and Storage Agreement

**You must scroll to the bottom of the entire Loan, Security and Storage Agreement to continue.**

### Loan, Security and Storage Agreement

In times of highly volatile markets, WORTH phone lines may be busy due to the volume of incoming and outgoing calls. It is also possible for telephone lines to fail for reasons beyond WORTH's control. Because of this, you are advised and will be responsible to have alternative methods to communicate with WORTH (e.g., e-mail, courier messenger service, etc.) should it become necessary to do so.

1. **Parties.** This Agreement is entered into between Worth Group, Inc. ("WORTH") and the borrower(s) ("Borrower" or "you") signing below.

2. **Financing.**

2.1 **Terms and Conditions.** At your request, WORTH may extend financing to you from time to time under the terms of this Agreement. Each such extension of financing by Worth to you shall be referred to herein as a "Loan," and all such extensions of financing shall be collectively referred to herein as the "Loans." Should WORTH make Loans to you hereunder, you shall execute a promissory note (the "Promissory Note") in form and substance satisfactory to WORTH to evidence the Loans. You agree that WORTH is authorized to record in its books and records the date and amount of the Loans made by WORTH; provided that the Lender's failure to record such Loans or the amounts paid thereon on its books shall not limit or otherwise affect the obligations of the Borrower hereunder or under the Loan Agreement to repay the principal of and interest on the Loans. WORTH shall send you a Monthly Statement setting forth the amount of the Loans then outstanding. The amount of Loans reflected in your Monthly Statement shall be deemed conclusive and binding upon you in the absence of manifest error.

WORTH will impose interest charges (sometimes referred to as "finance charges") on the outstanding and unpaid amount of each Loan. Interest (finance) charges are calculated by multiplying WORTH's prevailing periodic daily interest percentage rate (WORTH's annual interest percentage rate divided by 365) by the outstanding and unpaid amount of each Loan and by the number of applicable days. Interest charges are made to the account on the last day of each calendar month and at such other times as there is activity in the account. Activity in the account is any change in the balance of any Loan (increase or decrease) or the making of a new Loan. The interest rate charged by WORTH will be a variable rate over the prime rate, but will not exceed the prime rate by more than 8% per annum. The term "prime rate" means the current prime rate as correctly published in the U.S. Edition of the Wall Street Journal. WORTH may change its interest rate at any time.

Interest rates in effect are stated by WORTH on your Monthly Statement and in other documents used by WORTH from time to time to notify you of such rates. WORTH's determination of interest rates and calculation of interest owed shall be conclusive and binding upon you absent manifest error. The failure by WORTH to issue a Monthly Statement shall not limit or otherwise affect your obligations hereunder to repay the principal of and interest on the Loans.

You promise to repay the Loans at WORTH'S office in Florida on demand, or if no demand, five years from the date of this Agreement, together with interest thereon from the dates of each respective Loan at WORTH's prevailing announced finance rate, as such rate may change from time to time. Your failure to make such payments as required shall constitute a default; and WORTH shall have the right to dispose of all collateral and security provided by you or on your behalf, as provided in Section 13 hereof, and apply such proceeds against the obligations due it hereunder, including the Loans. Such right shall be without limitation to the value of the collateral and security and any other remedies granted to WORTH by this Agreement or otherwise by law.

Your loan balance may be paid in full by you any time without penalty.

**ACKNOWLEDGEMENT**

☐ I understand the Terms and Conditions.

Electronic Signature: [_____]   Date: [09/17/2018]   (MM/DD/YYYY)

Co-Applicant Signature: [_____]   Date: [09/17/2018]   (MM/DD/YYYY)

[ Continue ]   [ Back ]



 Current Prices   Gold **1203.30 (+9.60)** USD     Silver **14.21 (+0.15)** USD     Platinum **805.00 (+9.50)** USD     Palladium **986.00 (+6.00)** USD

## II. Loan, Security and Storage Agreement

### Please enter your signature below.

**You must scroll to the bottom of the entire Loan, Security and Storage Agreement to continue.**

### Loan, Security and Storage Agreement

In times of highly volatile markets, WORTH phone lines may be busy due to the volume of incoming and outgoing calls. It is also possible for telephone lines to fail for reasons beyond WORTH's control. Because of this, you are advised and will be responsible to have alternative methods to communicate with WORTH (e.g., e-mail, courier messenger service, etc.) should it become necessary to do so.

1. **Parties.** This Agreement is entered into between Worth Group, Inc. ("WORTH") and the borrower(s) ("Borrower" or "you") signing below.

2. **Financing.**

2.1 **Terms and Conditions.** At your request, WORTH may extend financing to you from time to time under the terms of this Agreement. Each such extension of financing by Worth to you shall be referred to herein as a "Loan," and all such extensions of financing shall be collectively referred to herein as the "Loans." Should WORTH make Loans to you hereunder, you shall execute a promissory note (the "Promissory Note") in form and substance satisfactory to WORTH to evidence the Loans. You agree that WORTH is authorized to record in its books and records the date and amount of the Loans made by WORTH; provided that the Lender's failure to record such Loans or the amounts paid thereon on its books shall not limit or otherwise affect the obligations of the Borrower hereunder or under the Loan Agreement to repay the principal of and interest on the Loans. WORTH shall send you a Monthly Statement setting forth the amount of the Loans then outstanding. The amount of Loans reflected in your Monthly Statement shall be deemed conclusive and binding upon you in the absence of manifest error.

WORTH will impose interest charges (sometimes referred to as "finance charges") on the outstanding and unpaid amount of each Loan. Interest (finance) charges are calculated by multiplying WORTH's prevailing periodic daily interest percentage rate (WORTH's annual interest percentage rate divided by 365) by the outstanding and unpaid amount of each Loan and by the number of applicable days. Interest charges are made to the account on the last day of each calendar month and at such other times as there is activity in the account. Activity in the account is any change in the balance of any Loan (increase or decrease) or the making of a new Loan. The interest rate charged by WORTH will be a variable rate over the prime rate, but will not exceed the prime rate by more than 8% per annum. The term "prime rate" means the current prime rate as correctly published in the U.S. Edition of the <u>Wall Street Journal</u>. WORTH may change its interest rate at any time.

Interest rates in effect are stated by WORTH on your Monthly Statement and in other documents used by WORTH from time to time to notify you of such rates. WORTH's determination of interest rates and calculation of interest owed shall be conclusive and binding upon you absent manifest error. The failure by WORTH to issue a Monthly Statement shall not limit or otherwise affect your obligations hereunder to repay the principal of and interest on the Loans.

You promise to repay the Loans at WORTH'S office in Florida on demand, or if no demand, five years from the date of this Agreement, together with interest thereon from the dates of each respective Loan at WORTH's prevailing announced finance rate, as such rate may change from time to time. Your failure to make such payments as required shall constitute a default; and WORTH shall have the right to dispose of all collateral and security provided by you or on your behalf, as provided in Section 13 hereof, and apply such proceeds against the obligations due it hereunder, including the Loans. Such right shall be without limitation to the value of the collateral and security and any other remedies granted to WORTH by this Agreement or otherwise by law.

Your loan balance may be paid in full by you any time without penalty.

**ACKNOWLEDGEMENT**

☐ I understand the Terms and Conditions.

Electronic Signature: [                    ] Date: [ 09/17/2018 ] (MM/DD/YYYY)

Co-Applicant Signature: [                    ] Date: [ 09/17/2018 ] (MM/DD/YYYY)

[ Continue ]  [ Back ]



| | Current Prices | Gold **1203.30 (+9.60)** USD | Silver **14.21 (+0.15)** USD | Platinum **805.00 (+9.50)** USD | Palladium **986.00 (+6.00)** USD |

## II. Loan, Security and Storage Agreement

### Please enter your signature below.

**You must scroll to the bottom of the entire Loan, Security and Storage Agreement to continue.**

Palm Beach County, Florida; all deposits and payments made by Borrower will be delivered to and paid in Palm Beach County, Florida; all loans made by WORTH will be made from and paid in Palm Beach County, Florida; and the written confirmation of each transaction and all statements of account will be generated in and transmitted from Palm Beach County, Florida.

35. **Arbitration.**

a. **Arbitration of Claims.** The parties agree that any and all disputes, claims or controversies arising out of or relating to any transaction between or among them or to the breach, termination, enforcement, interpretation, validity or alleged unconscionability of any part of this Agreement shall be subject to and governed by the Federal Arbitration Act and shall be submitted to final and binding arbitration before JAMS, or its successor, in Palm Beach County, Florida. The parties also agree that this Agreement and the transactions entered into pursuant to it are commercial in nature (i.e., for investment) and do not involve consumer transactions (i.e., transactions entered into for personal, family or household purposes) under JAMS rules, or otherwise.

b. **Additional Participants in this Agreement to Arbitrate.** All shareholders, officers and directors of WORTH, and all employees, representatives, agents and affiliates of WORTH, past, present or future, are beneficiaries of, and participants in, this arbitration agreement. They will have the same rights and obligations under this arbitration agreement as the parties, to the extent that these arbitration agreement beneficiaries are named as respondents in any dispute, claim or controversy subject to or arising from this Agreement, or could have been so named.

c. **Initiation of Arbitration.** Any party may commence the arbitration process by filing a written demand for arbitration with the nearest JAMS office to Miami, Florida, with a copy to the other party(ies).

d. **Arbitration Rules and Fees.** . Except as otherwise provided herein, the arbitration shall be conducted in accordance with the provisions of JAMS Comprehensive Arbitration Rules and Procedures in effect at the time of Borrower's execution of this Agreement (the "JAMS Rules"). The JAMS Rules shall apply regardless of the amount of the claims or cross claims in the proceeding. Discovery may be taken by the parties only in the manner prescribed by the JAMS Rules. In the discretion of the arbitrator(s), pre-arbitration conferences and hearings may be telephonic.

You can find the JAMS Rules on JAMS' Internet web site: www.jamsadr.com. You can also obtain a copy of the JAMS Rules and information concerning JAMS' administrative and arbitrator fees by calling JAMS national toll free number at 800-352-5267. Currently, arbitrator fees range from about $350 or $600 per hour of service while some arbitrators charge a per diem fee. Hearings can be as short as one or two days, but could run five days or longer. Each side will also be charged an initial case management fee (currently $400).

You should review the JAMS rules, and pay attention to the arbitration fees which JAMS will charge the parties, as further discussed below in Section 35.i. You should also be aware that JAMS' fees change from time to time, and that JAMS' fee at the time of any dispute may be higher than at the time that you enter into this Agreement.

e. **Arbitrators.** The parties agree that a single arbitrator shall be selected to adjudicate all disputes unless otherwise provided for in this Agreement. The selection and replacement of an arbitrator or arbitrators shall be in accordance with the JAMS Rules, except that: (i) each arbitrator shall be a retired judge of either the Florida Circuit Court or a United States District Court located in Florida, and (ii) any party may require a panel of three neutral arbitrators.

**ACKNOWLEDGEMENT**

☑ I understand the Terms and Conditions.

Electronic Signature: John Tester     Date: 09/17/2018 (MM/DD/YYYY)

Co-Applicant Signature: _____     Date: 09/17/2018 (MM/DD/YYYY)

[ Continue ]  [ Back ]



Exhibit 7



 Current Prices    Gold **1202.72 (+9.02)** USD    Silver **14.21 (+0.15)** USD    Platinum **804.50 (+9.00)** USD    Palladium **986.00 (+6.00)** USD

## III. Authorization to Transfer Funds and Additional Information

I hereby authorize WORTH GROUP, INC. to transfer excess funds that I hold in any account with it to any other account that I hold with it, without further authorization or notice necessary, to prevent or meet a call for additional collateral, or prevent a default, to pay for, collateralize or finance any cash purchase or borrowed commodity transaction that I have made, or to pay monthly service charges, delivery fees and handing costs in any of my accounts with those companies. This authorization shall remain in effect until revoked or modified by the undersigned in writing.

Electronic Signature: _____    Date: 09/17/2018   (MM/DD/YYYY)

Co-Applicant Signature: _____    Date: 09/17/2018   (MM/DD/YYYY)

### ADDITIONAL INFORMATION

**AML POLICY:** To comply with Federal ANTI MONEY LAUNDERING laws, we ask that you provide us at the time you open your account with a current government-issued photo-bearing identification with current residential address (e.g., driver's license, passport, state or national identity card). If you are a corporation, partnership, limited liability company or trust, we ask that you provide us with a certified copy of your articles or certificate of incorporation or organization or partnership or trust agreement, as appropriate, and a certificate of good standing or active status issued by the jurisdiction of formation or incorporation. We also ask that you complete the attached one page form.

**PRIVACY POLICY:** Maintaining the privacy of your personal information is of the utmost importance to us. In order to provide services to you, we must maintain certain information that we collect from account applications or other forms that you complete, transactions that you conduct and communications with our affiliates and us. It is our policy not to disclose your personal information to third parties except as permitted by law or requested by you. We also restrict access to nonpublic personal information to those employees who need to know that information to provide service to you. You are welcome to contact us at 1-866-705-4150 if you have any questions regarding our Privacy Policy. We reserve the right to revise our policy and will provide you notice of any revisions.

**If you have any questions please contact us at 1-866-705-4150**

#### Electronic Signature Addendum

You hereby consent and agree that your use of a key pad, mouse or other device to select an item, button, icon or similar act/action while using any electronic service we offer; or in accessing or making any transactions regarding any agreement, acknowledgment, consent, terms, disclosures or conditions constitutes your signature, acceptance and agreement as if actually signed by you in writing. Further, you agree that no certification, authority or other third party verification is necessary to validate your electronic signature; and that the lack of such certification or third party verification will not in any way affect the enforceability of your signature or any resulting contract between you and Worth Group, Inc.

By clicking CONTINUE below, I hereby represent that the information provided by me on the customer information section of this packet is true and correct. I further represent that I will notify Worth Group, Inc of any material changes. Worth Group, Inc reserves the right, but has no duty, to verify the accuracy of information provided, and to contact such bankers, brokers and others as it deems necessary.

I acknowledge that this is a legally binding contractual agreement. I have read it carefully, and by submitting this agreement application, I agree to be bound by every term and condition. No modification of this Agreement is valid unless accepted by Worth Group, Inc in writing. I confirm that I have not made any alterations or deletions to this agreement or any such documents from the original forms posted on the website. In the event that there are any alterations or deletions to this agreement or any such documents such alteration and deletions shall not be binding on you and said original forms shall govern Trader account relationship with Worth Group, Inc.

☐ **I hereby warrant that the foregoing answers are true and correct to the best of my knowledge and that I have not been instructed by anyone to misrepresent any fact herein. Worth Group, Inc. may rely on the above information in determining whether to extend me credit.**

Signature: _____    Date: 09/17/2018   (MM/DD/YYYY)

Co-Applicant Signature: _____    Date: 09/17/2018   (MM/DD/YYYY)

[ Continue ]    [ Back ]



 Current Prices   Gold **1202.72 (+9.02)** USD   Silver **14.21 (+0.15)** USD   Platinum **804.50 (+9.00)** USD   Palladium **986.00 (+6.00)** USD

### III. Authorization to Transfer Funds and Additional Information

<span style="color:red">**You must enter a value in the following fields:**
**Please enter your signature below.**
**Please enter your Signature below.**</span>

I hereby authorize WORTH GROUP, INC. to transfer excess funds that I hold in any account with it to any other account that I hold with it, without further authorization or notice necessary, to prevent or meet a call for additional collateral, or prevent a default, to pay for, collateralize or finance any cash purchase or borrowed commodity transaction that I have made, or to pay monthly service charges, delivery fees and handing costs in any of my accounts with those companies. This authorization shall remain in effect until revoked or modified by the undersigned in writing.

Electronic Signature: [_____]  Date: [09/17/2018]  (MM/DD/YYYY)

Co-Applicant Signature: [_____]  Date: [09/17/2018]  (MM/DD/YYYY)

#### ADDITIONAL INFORMATION

**AML POLICY:** To comply with Federal ANTI MONEY LAUNDERING laws, we ask that you provide us at the time you open your account with a current government-issued photo-bearing identification with current residential address (e.g., driver's license, passport, state or national identity card). If you are a corporation, partnership, limited liability company or trust, we ask that you provide us with a certified copy of your articles or certificate of incorporation or organization or partnership or trust agreement, as appropriate, and a certificate of good standing or active status issued by the jurisdiction of formation or incorporation. We also ask that you complete the attached one page form.

**PRIVACY POLICY:** Maintaining the privacy of your personal information is of the utmost importance to us. In order to provide services to you, we must maintain certain information that we collect from account applications or other forms that you complete, transactions that you conduct and communications with our affiliates and us. It is our policy not to disclose your personal information to third parties except as permitted by law or requested by you. We also restrict access to nonpublic personal information to those employees who need to know that information to provide service to you. You are welcome to contact us at 1-866-705-4150 if you have any questions regarding our Privacy Policy. We reserve the right to revise our policy and will provide you notice of any revisions.

**If you have any questions please contact us at 1-866-705-4150**

**Electronic Signature Addendum**

You hereby consent and agree that your use of a key pad, mouse or other device to select an item, button, icon or similar act/action while using any electronic service we offer; or in accessing or making any transactions regarding any agreement, acknowledgment, consent, terms, disclosures or conditions constitutes your signature, acceptance and agreement as if actually signed by you in writing. Further, you agree that no certification, authority or other third party verification is necessary to validate your electronic signature; and that the lack of such certification or third party verification will not in any way affect the enforceability of your signature or any resulting contract between you and Worth Group, Inc.

By clicking CONTINUE below, I hereby represent that the information provided by me on the customer information section of this packet is true and correct. I further represent that I will notify Worth Group, Inc of any material changes. Worth Group, Inc reserves the right, but has no duty, to verify the accuracy of information provided, and to contact such bankers, brokers and others as it deems necessary.

I acknowledge that this is a legally binding contractual agreement. I have read it carefully, and by submitting this agreement application, I agree to be bound by every term and condition. No modification of this Agreement is valid unless accepted by Worth Group, Inc in writing. I confirm that I have not made any alterations or deletions to this agreement or any such documents from the original forms posted on the website. In the event that there are any alterations or deletions to this agreement or any such documents such alteration and deletions shall not be binding on you and said original forms shall govern Trader account relationship with Worth Group, Inc.

☐ **I hereby warrant that the foregoing answers are true and correct to the best of my knowledge and that I have not been instructed by anyone to misrepresent any fact herein. Worth Group, Inc. may rely on the above answers in determining whether to extend me credit.**

Signature: [_____]  Date: [09/17/2018]  (MM/DD/YYYY)

Co-Applicant Signature: [_____]  Date: [09/17/2018]  (MM/DD/YYYY)

[ Continue ]  [ Back ]

WorthGroup    Home    Products    Quotes & Charts    Wholesale    Forms    IRAs    Contact



| | Current Prices | Gold **1202.72 (+9.02)** USD | Silver **14.21 (+0.15)** USD | Platinum **804.50 (+9.00)** USD | Palladium **986.00 (+6.00)** USD |

## III. Authorization to Transfer Funds and Additional Information

I hereby authorize WORTH GROUP, INC. to transfer excess funds that I hold in any account with it to any other account that I hold with it, without further authorization or notice necessary, to prevent or meet a call for additional collateral, or prevent a default, to pay for, collateralize or finance any cash purchase or borrowed commodity transaction that I have made, or to pay monthly service charges, delivery fees and handing costs in any of my accounts with those companies. This authorization shall remain in effect until revoked or modified by the undersigned in writing.

Electronic Signature: John Tester     Date: 09/17/2018  (MM/DD/YYYY)

Co-Applicant Signature: _____     Date: 09/17/2018  (MM/DD/YYYY)

### ADDITIONAL INFORMATION

**AML POLICY:** To comply with Federal ANTI MONEY LAUNDERING laws, we ask that you provide us at the time you open your account with a current government-issued photo-bearing identification with current residential address (e.g., driver's license, passport, state or national identity card). If you are a corporation, partnership, limited liability company or trust, we ask that you provide us with a certified copy of your articles or certificate of incorporation or organization or partnership or trust agreement, as appropriate, and a certificate of good standing or active status issued by the jurisdiction of formation or incorporation. We also ask that you complete the attached one page form.

**PRIVACY POLICY:** Maintaining the privacy of your personal information is of the utmost importance to us. In order to provide services to you, we must maintain certain information that we collect from account applications or other forms that you complete, transactions that you conduct and communications with our affiliates and us. It is our policy not to disclose your personal information to third parties except as permitted by law or requested by you. We also restrict access to nonpublic personal information to those employees who need to know that information to provide service to you. You are welcome to contact us at 1-866-705-4150 if you have any questions regarding our Privacy Policy. We reserve the right to revise our policy and will provide you notice of any revisions.

**If you have any questions please contact us at 1-866-705-4150**

**Electronic Signature Addendum**

You hereby consent and agree that your use of a key pad, mouse or other device to select an item, button, icon or similar act/action while using any electronic service we offer; or in accessing or making any transactions regarding any agreement, acknowledgment, consent, terms, disclosures or conditions constitutes your signature, acceptance and agreement as if actually signed by you in writing. Further, you agree that no certification, authority or other third party verification is necessary to validate your electronic signature; and that the lack of such certification or third party verification will not in any way affect the enforceability of your signature or any resulting contract between you and Worth Group, Inc.

By clicking CONTINUE below, I hereby represent that the information provided by me on the customer information section of this packet is true and correct. I further represent that I will notify Worth Group, Inc of any material changes. Worth Group, Inc reserves the right, but has no duty, to verify the accuracy of information provided, and to contact such bankers, brokers and others as it deems necessary.

I acknowledge that this is a legally binding contractual agreement. I have read it carefully, and by submitting this agreement application, I agree to be bound by every term and condition. No modification of this Agreement is valid unless accepted by Worth Group, Inc in writing. I confirm that I have not made any alterations or deletions to this agreement or any such documents from the original forms posted on the website. In the event that there are any alterations or deletions to this agreement or any such documents such alteration and deletions shall not be binding on you and said original forms shall govern Trader account relationship with Worth Group, Inc.

☑ **I hereby warrant that the foregoing answers are true and correct to the best of my knowledge and that I have not been instructed by anyone to misrepresent any fact herein. Worth Group, Inc. may rely on the above information in determining whether to extend me credit.**

Signature: John Tester     Date: 09/17/2018  (MM/DD/YYYY)

Co-Applicant Signature: _____     Date: 09/17/2018  (MM/DD/YYYY)

[Continue]  [Back]

Exhibit 8



|  Current Prices | Gold **1202.83 (+9.13)** USD | Silver **14.20 (+0.14)** USD | Platinum **804.00 (+8.50)** USD | Palladium **985.50 (+5.50)** USD |

# IV. Instruction Letter

Dear John Tester,

As you know, you maintain an account with Worth Group, Inc. ("Worth Group") or one or more retail brokers through which you may, from time to time, purchase gold, silver, platinum and other precious metals. Worth Group may have in the past and may in the future extend loans (each a "Loan") to you in connection with such purchases and either has sold or may sell those loans from time to time to one or more third parties under the terms of your applicable brokerage agreements.

In the event that Worth Group has sold or in the future sells a Loan to Collateral Finance Corporation ("CFC"), your metal serving as collateral (the "Collateral") for the Loan has been or will be transferred from the possession of Worth Group to the possession of CFC in order to maintain the perfection of CFC's security interest in the Collateral (the "Security Interest"), although you at all times retain title to the Collateral pursuant to the terms of your account documentation. Once your Loan has been repaid in full, or if the Security Interest in a portion of the Collateral is released by CFC (in its sole and absolute discretion) for any other reason as a result of a request by Worth Group on your behalf (which you hereby authorize) ( a "Release of Collateral"), such Collateral will be returned to you. By signing and returning a copy of this letter, you hereby instruct CFC, upon a Release of Collateral, to implement such return of Collateral by transferring such Collateral to Worth Group for deposit into your account. This will allow you to continue to make trades through Worth Group until you choose to close your account. Because you retain title to the Collateral, you may contact CFC at any time prior to a Release of Collateral and instruct CFC to return Collateral to you in any other manner permitted by law.

Please note that you will retain title to the Collateral at all times regardless of whether the Collateral is maintained at Worth Group or with CFC.

By acknowledging and returning a copy of this letter, you hereby confirm notice of the foregoing and instruct CFC to return any Collateral to your account at Worth Group upon a Release of Collateral. You further authorize Worth Group to provide this letter to CFC as evidence of your instruction and agree that CFC shall not be liable to you for complying with and relying on your instruction unless it is revoked by you, in writing and received by CFC prior to a Release of Collateral. As noted above, you may revoke this instruction with respect to a Release of Collateral at any time prior to a Release of Collateral by providing written notice to Worth Group and CFC.

Thank you for your business, and let me know if you have any questions or comments.

Very truly yours,

Worth Group, Inc.

**Electronic Signature Addendum**
You hereby consent and agree that your use of a key pad, mouse or other device to select an item, button, icon or similar act/action while using any electronic service we offer; or in accessing or making any transactions regarding any agreement, acknowledgment, consent, terms, disclosures or conditions constitutes your signature, acceptance and agreement as if actually signed by you in writing. Further, you agree that no certification, authority or other third party verification is necessary to validate your electronic signature; and that the lack of such certification or third party verification will not in any way affect the enforceability of your signature or any resulting contract between you and Worth Group, Inc.

I have read the foregooing Instruction Letter & Account Addendum carefully, and by clicking AGREE & CONTINUE below, I agree to be bound by every term and condition. I confirm that I have not made any alterations or deletions to this agreement or any such documents from the original forms posted on the website. In the event that there are any alterations or deletions to this agreement or any such documents such alteration and deletions shall not be binding on you and said original forms shall govern Trader account relationship with Worth Group, Inc.

**ACKNOWLEDGEMENT**

☐ I have read and understand the foregoing Instruction Letter and Account Addendum related to investing in precious metal investments with Worth Group, Inc.

Electronic Signature: [_____]  Date: 09/17/2018

[ Agree & Continue ]



Home    Products    Quotes & Charts    Wholesale    Forms    IRAs    Contact



| | Current Prices | Gold **1202.83 (+9.13)** USD | Silver **14.20 (+0.14)** USD | Platinum **804.00 (+8.50)** USD | Palladium **985.50 (+5.50)** USD |

## IV. Instruction Letter

Dear John Tester,

As you know, you maintain an account with Worth Group, Inc. ("Worth Group") or one or more retail brokers through which you may, from time to time, purchase gold, silver, platinum and other precious metals. Worth Group may have in the past and may in the future extend loans (each a "Loan") to you in connection with such purchases and either has sold or may sell those loans from time to time to one or more third parties under the terms of your applicable brokerage agreements.

In the event that Worth Group has sold or in the future sells a Loan to Collateral Finance Corporation ("CFC"), your metal serving as collateral (the "Collateral") for the Loan has been or will be transferred from the possession of Worth Group to the possession of CFC in order to maintain the perfection of CFC's security interest in the Collateral (the "Security Interest"), although you at all times retain title to the Collateral pursuant to the terms of your account documentation. Once your Loan has been repaid in full, or if the Security Interest in a portion of the Collateral is released by CFC (in its sole and absolute discretion) for any other reason as a result of a request by Worth Group on your behalf (which you hereby authorize) ( a "Release of Collateral"), such Collateral will be returned to you. By signing and returning a copy of this letter, you hereby instruct CFC, upon a Release of Collateral, to implement such return of Collateral by transferring such Collateral to Worth Group for deposit into your account. This will allow you to continue to make trades through Worth Group until you choose to close your account. Because you retain title to the Collateral, you may contact CFC at any time prior to a Release of Collateral and instruct CFC to return Collateral to you in any other manner permitted by law.

Please note that you will retain title to the Collateral at all times regardless of whether the Collateral is maintained at Worth Group or with CFC.

By acknowledging and returning a copy of this letter, you hereby confirm notice of the foregoing and instruct CFC to return any Collateral to your account at Worth Group upon a Release of Collateral. You further authorize Worth Group to provide this letter to CFC as evidence of your instruction and agree that CFC shall not be liable to you for complying with and relying on your instruction unless it is revoked by you, in writing and received by CFC prior to a Release of Collateral. As noted above, you may revoke this instruction with respect to a Release of Collateral at any time prior to a Release of Collateral by providing written notice to Worth Group and CFC.

Thank you for your business, and let me know if you have any questions or comments.

Very truly yours,

Worth Group, Inc.

**Electronic Signature Addendum**
You hereby consent and agree that your use of a key pad, mouse or other device to select an item, button, icon or similar act/action while using any electronic service we offer; or in accessing or making any transactions regarding any agreement, acknowledgment, consent, terms, disclosures or conditions constitutes your signature, acceptance and agreement as if actually signed by you in writing. Further, you agree that no certification, authority or other third party verification is necessary to validate your electronic signature; and that the lack of such certification or third party verification will not in any way affect the enforceability of your signature or any resulting contract between you and Worth Group, Inc.

I have read the foregooing Instruction Letter & Account Addendum carefully, and by clicking AGREE & CONTINUE below, I agree to be bound by every term and condition. I confirm that I have not made any alterations or deletions to this agreement or any such documents from the original forms posted on the website. In the event that there are any alterations or deletions to this agreement or any such documents such alteration and deletions shall not be binding on you and said original forms shall govern Trader account relationship with Worth Group, Inc.

**ACKNOWLEDGEMENT**

☐ I have read and understand the foregoing Instruction Letter and Account Addendum related to investing in precious metal investments with Worth Group, Inc.

<span style="color:red">Please enter your signature below.</span>
Electronic Signature: [_____]   Date: [09/17/2018]

[ Agree & Continue ]



Home    Products    Quotes & Charts    Wholesale    Forms    IRAs    Contact



|  Current Prices | Gold **1202.83 (+9.13)** USD | Silver **14.20 (+0.14)** USD | Platinum **804.00 (+8.50)** USD | Palladium **985.50 (+5.50)** USD |

## IV. Instruction Letter

Dear John Tester,

As you know, you maintain an account with Worth Group, Inc. ("Worth Group") or one or more retail brokers through which you may, from time to time, purchase gold, silver, platinum and other precious metals. Worth Group may have in the past and may in the future extend loans (each a "Loan") to you in connection with such purchases and either has sold or may sell those loans from time to time to one or more third parties under the terms of your applicable brokerage agreements.

In the event that Worth Group has sold or in the future sells a Loan to Collateral Finance Corporation ("CFC"), your metal serving as collateral (the "Collateral") for the Loan has been or will be transferred from the possession of Worth Group to the possession of CFC in order to maintain the perfection of CFC's security interest in the Collateral (the "Security Interest"), although you at all times retain title to the Collateral pursuant to the terms of your account documentation. Once your Loan has been repaid in full, or if the Security Interest in a portion of the Collateral is released by CFC (in its sole and absolute discretion) for any other reason as a result of a request by Worth Group on your behalf (which you hereby authorize) ( a "Release of Collateral"), such Collateral will be returned to you. By signing and returning a copy of this letter, you hereby instruct CFC, upon a Release of Collateral, to implement such return of Collateral by transferring such Collateral to Worth Group for deposit into your account. This will allow you to continue to make trades through Worth Group until you choose to close your account. Because you retain title to the Collateral, you may contact CFC at any time prior to a Release of Collateral and instruct CFC to return Collateral to you in any other manner permitted by law.

Please note that you will retain title to the Collateral at all times regardless of whether the Collateral is maintained at Worth Group or with CFC.

By acknowledging and returning a copy of this letter, you hereby confirm notice of the foregoing and instruct CFC to return any Collateral to your account at Worth Group upon a Release of Collateral. You further authorize Worth Group to provide this letter to CFC as evidence of your authorization and agree that CFC shall not be liable to you for complying with and relying on your instruction unless it is revoked by you, in writing and received by CFC prior to a Release of Collateral. As noted above, you may revoke this instruction with respect to a Release of Collateral at any time prior to a Release of Collateral by providing written notice to Worth Group and CFC.

Thank you for your business, and let me know if you have any questions or comments.

Very truly yours,

Worth Group, Inc.


**Electronic Signature Addendum**

You hereby consent and agree that your use of a key pad, mouse or other device to select an item, button, icon or similar act/action while using any electronic service we offer; or in accessing or making any transactions regarding any agreement, acknowledgment, consent, terms, disclosures or conditions constitutes your signature, acceptance and agreement as if actually signed by you in writing. Further, you agree that no certification, authority or other third party verification is necessary to validate your electronic signature; and that the lack of such certification or third party verification will not in any way affect the enforceability of your signature or any resulting contract between you and Worth Group, Inc.

I have read the foregoing Instruction Letter & Account Addendum carefully, and by clicking AGREE & CONTINUE below, I agree to be bound by every term and condition. I confirm that I have not made any alterations or deletions to this agreement or any such documents from the original forms posted on the website. In the event that there are any alterations or deletions to this agreement or any such documents such alteration and deletions shall not be binding on you and said original forms shall govern Trader account relationship with Worth Group, Inc.

**ACKNOWLEDGEMENT**

☑ I have read and understand the foregoing Instruction Letter and Account Addendum related to investing in precious metal investments with Worth Group, Inc.

Please enter your signature below.
Electronic Signature: John Tester       Date: 09/17/2018

Agree & Continue



Home    Products    Quotes & Charts    Wholesale    Forms    IRAs    Contact

**Worth Group**

Current Prices    Gold **1203.10 (+9.40)** USD         Silver **14.21 (+0.15)** USD         Platinum **804.00 (+8.50)** USD         Palladium **985.50 (+5.50)** USD

**Thank You**

Your application was received successfully. An account representative will be in touch shortly.

You should also be receiving a copy of your completed application to the email address you provided.

Thank you,

Worth Group, Inc

**Worth Group**

Home    Products    Quotes & Charts    Wholesale    Forms    IRAs    Contact

Exhibit 9

**How to open an Account**

Enclosed you will find the necessary documents to open a precious metals account with Treasure Coast Bullion Group, Inc. ("TREASURE COAST")   Please read them and then sign, complete and return the Account Agreement. You may access this Agreement through the TREASURE COAST website.

A.      **Purchase and Sale Agreement**. Be sure to include name(s), address(es), social security or tax identification number(s), telephone number (s), e-mail address(es) and indicate account type. Have all parties sign and date.

Signing this agreement in no way obligates you to do business with TREASURE COAST.

Return the complete Account Agreement in the business envelope provided.

| attention |
|---|
| To complete these agreements each account owner must: |
| 1.   Sign and complete pages 18 through 20. |
| 2.   Provide his/her/its Social Security Number or other Federal Tax ID Number. |
| 3.   Provide a complete Address and e-mail address. |
| 4.   <u>Trust, Partnership, Limited Liability Company or Corporate Account</u> - must enclose complete copy of Trust Agreement, Partnership Agreement, Limited Liability Company Agreement or Corporate Resolution. |
| **ONLY COMPLETE ACCOUNT DOCUMENTS WILL BE PROCESSED** |

A complete Account Agreement must be returned to TREASURE COAST. Individual signature pages will not be accepted.

**ANY DELETIONS FROM, ADDITIONS TO OR CUTTING OR MUTILATION OF ANY PORTION OF THIS AGREEMENT WILL RENDER THE AGREEMENT UNACCEPTABLE.**

9/1/2017          1:34:09PM

**Account Agreement**

1.  **Parties.** This Agreement is entered into between Treasure Coast Bullion Group, Inc.("TREASURE COAST") and the customer ("Customer" or "you") signing below.

2.  **Purpose of Agreement.** This Agreement provides for the establishment of an account with TREASURE COAST for the purchase and sale of precious metals (sometimes referred to as "precious metals," "coins," "products" or "goods") and shall apply to all such transactions between you and TREASURE COAST. You represent that all of your transactions with TREASURE COAST shall be for investment or other commercial purposes and not for any personal, family or household purposes.

3.  **Risks and Obligations.**

3.1  **Acknowledgment of Risk.** Because of the volatile nature of the precious metals markets, the purchase and sale of precious metals involve a high degree of risk and are not suitable for all persons.

3.2  **Your Rights, Obligations and Risks.** It is important that you read and understand this Agreement, particularly your rights, obligations and risks hereunder. It is also important that you seek the advice of your attorney if you do not have these understandings. By signing this Agreement, you represent that you have read and understand the Agreement and have consulted with your attorney, as necessary, to achieve such understanding.

4.  **Transactions and Role of TREASURE COAST.**

4.1  **Types of Transactions.** Your transactions with TREASURE COAST are either fully paid for at inception or financed with Worth Group, Inc. All transactions you finance with Worth Group involve delivery within at most 28 days of the date of purchase. See Section 7. As a result they are not regulated by the Commodity Futures Trading Commission or the National Futures Association.

4.2  **Role of TREASURE COAST.** TREASURE COAST acts as a principal and as such sells to and buys from customers on its own behalf. This means that TREASURE COAST is a market maker and dealer in precious metals. TREASURE COAST is not an exchange or brokerage house. Neither TREASURE COAST nor any of its employees acts as an agent or fiduciary for any of TREASURE COAST's customers. TREASURE COAST does not offer managed accounts.

5.  **Precious Metals Which May Be Offered by TREASURE COAST.**

5.1  **Gold Bullion (10 Oz.).** Ten troy ounces of at least .995 fine gold.

5.2  **Gold Bullion Coins.** American 1 troy ounce, ½ ounce, ¼ ounce and 1/10 ounce Eagles; American 1 troy ounce Buffalos; South African 1 troy ounce Krugerrands; Canadian 1 troy ounce, ½ ounce, ¼ ounce and 1/10 ounce Maple Leafs; Austrian 1 troy ounce, ½ ounce, ¼ ounce and 1/10 ounce Vienna Philharmonics. The one-ounce coins are sold in units of 10 coins. The other coins are sold in 20-coin units. There is no mixing of coins.

5.3  **Silver Bullion.** 1,000 troy ounces of at least .999 fine silver.

5.4  **Silver Ingots.** 100 troy ounces of .999 fine silver.

5.5  **90% U.S. Silver Coins.** $1,000 face value bags of U.S. Silver coins of a single denomination minted prior

**5.6**    **40% U.S. Silver Coins**. $1,000 face value bags of U.S. Silver Kennedy half-dollars minted from 1965 through 1970. Each bag contains approximately 295 troy ounces of pure silver.

**5.7**    **Silver Bullion Coins**. American Eagle, Canadian Maple Leaf and Austrian Vienna Philharmonic one troy ounce coins. Each sold in units of 100 coins.

**5.8**    **Platinum Bullion**. 10 troy ounces of at least .9995 fine platinum.

**5.9**    **Platinum Bullion Coins**. American 1 troy ounce, ½ ounce, ¼ ounce and 1/10 ounce Eagles; Canadian 1 troy ounce, ½ ounce, ¼ ounce and 1/10 ounce Maple Leafs. The one-ounce coins are sold in units of 10 coins. The other platinum coins are sold in 20-coin units. There is no mixing of coins.

**5.10**   **Palladium Bullion**. 10 troy ounces of at least .999 palladium bullion.

**5.11**   **Palladium Bullion Coins**. Canadian Maple Leaf 1 troy ounce coins sold in units of 10 coins.

**5.12**   **Changes in Metals Offered**. Precious metals may be added to or deleted from the above list by TREASURE COAST at any time.

**6.**     **Relationship Between Coin and Bullion Prices.** To the extent that a coin or ingot sells for more than the value of its metal content, that difference is called a "premium." When a coin or ingot sells for less than its underlying metal value, that difference is called a "discount." The premium or discount on each type of coin or coin-like ingot offered by TREASURE COAST may vary significantly from day to day.

**7.**     **Terms of Purchase, Sale and Delivery**.

**7.1**    **Purchases from TREASURE COAST**. All purchases of coins from TREASURE COAST are fully paid cash transactions. Purchases of bullion or ingots may either be for the full cash price or financed with Worth Group, Inc. ("WORTH GROUP"). At the time of verbal confirmation of a purchase, you will be advised of the amount due, which amount must be remitted and/or transferred to TREASURE COAST within the time specified below. If Customer is using funds in his WORTH GROUP account to pay all or part of the amount due, Customer authorizes TREASURE COAST to transfer such funds from his WORTH GROUP account to TREASURE COAST.

You must send required funds to TREASURE COAST within 24 hours of the transaction so that TREASURE COAST receives them within two business days or such shorter period as TREASURE COAST may require. Failure to make such timely payment shall constitute a default by Customer. Upon such default, TREASURE COAST will be relieved of all its obligations under the transaction and may recover from you as liquidated damages the difference between the purchase price you agreed to and TREASURE COAST's bid price for the precious metals at the time of default, plus TREASURE COAST's buy and sell charges (that is, TREASURE COAST's commissions), if any.

Receipt and credit by TREASURE COAST of your funds after this two day period, or such shorter period as TREASURE COAST may require, shall not waive or limit TREASURE COAST's remedies for default. You will not be entitled to any market gains on a transaction on which you have defaulted.

**7.2**    **Sales to TREASURE COAST.** Upon verbal confirmation of a sale of precious metals to TREASURE COAST, you will be advised that you have two days, or such shorter period as TREASURE COAST may require, to make delivery to TREASURE COAST. TREASURE COAST shall make full payment to you, or on your behalf of, upon TREASURE COAST's verification that it has received delivery of the precious metals. Your failure to effect delivery within the required time period shall constitute a default. Upon default, TREASURE COAST will be relieved of all its obligations under

the transaction and may recover from you as liquidated damages the difference between the sale price you agreed to and TREASURE COAST's ask price for the precious metals at the time of default, plus TREASURE COAST's buy and sell charges (that is, TREASURE COAST's commissions), if any. Receipt of precious metals from you after this two day period, or such shorter period if required, shall not waive or limit TREASURE COAST's remedies for default.

**7.3**   **Delivery to Customer or on Customer's Behalf.** Upon receipt of the required amount of good funds from you of the full purchase price for the purchase of precious metals, TREASURE COAST may deliver or cause the delivery of the precious metals (i) to you, (ii) to your appointed agent or designee, or (iii) for your benefit to a depository used by TREASURE COAST for the purpose of safekeeping precious metals (collectively referred to as a "Bank"). If the precious metals are purchased for the Customer in London, they will be allocated to the Customer by a member of the London Bullion Market Association ("LBMA") and may be held in the United Kingdom according to the allocation rules of the LBMA. You will be required to provide your name and complete residential address (not a Post Office Box number) with a copy of a current government-issued photo-bearing identification (such as a driver's license, passport, state or national identification card) and e-mail address and Social Security Number or other Federal Tax ID Number at the time you place your order. **If you are not taking physical delivery of precious metals purchased without using financing, TREASURE COAST may also cover the purchase with offsetting cash forward or other contracts or metals financed with one or more of its suppliers until physical delivery is required.** If you finance a portion of the purchase price with WORTH GROUP, delivery will be made to and the precious metals shall be stored with a Bank until the full purchase price is paid off.

Purchases of precious metals designated for delivery to a Bank in either the U.S. or in the United Kingdom will be delivered within such period as required by law following receipt of payment in good funds from Customer. You may take personal possession of your precious metals at any time, provided such precious metals are free and clear of all liens.

Customer agrees that TREASURE COAST shall have made delivery when title to the precious metals purchased by Customer passes to You (See Section 7.4). "Good funds" means the verified receipt of immediately available funds. (See Section 7.5)

When a customer wishes to take personal delivery of 1,000 troy ounces of silver, TREASURE COAST may deliver a bar weighing nominally 1,000 troy ounces or ten 100 troy ounce bars. When a customer wishes to take personal delivery of a 10 troy ounce palladium unit, TREASURE COAST may deliver bars of various weights totaling 10 ounces or, for deliveries of more than one unit of palladium, include larger bars weighing nominally 100 ounces. Actual weight of the silver and larger palladium bars is plus or minus 10%. On personal delivery of bars of nominal weight, prices will be adjusted to actual weight. Any overage or underage will be priced based upon TREASURE COAST's prevailing ask or bid price, respectively, for 1,000 troy ounce silver units or 10 troy ounce palladium units, as appropriate, at the time of delivery. When a customer wishes to take personal delivery of amounts of precious metals which do not correspond to TREASURE COAST's standard units, TREASURE COAST may deliver such metals in the form the customer and TREASURE COAST agree or in such form as TREASURE COAST in good faith determines most closely approximates the value of the units of such metal TREASURE COAST at the time deals in.

**7.4**   **Service / Storage Charges.** If your precious metals are delivered to the Bank, a monthly service/storage charge will be imposed on your account at the close of business on the last day of each month based on the units of precious metals in your account at the Bank that are designated for delivery to or stored by Bank at such time.   The unit charges are applicable as of month-end, irrespective of the number of days the precious metals are held in your account.   TREASURE COAST reserves the right to change prospectively at any time and at its sole discretion any of its service/storage fees.   Current service and storage charges are available upon your request.

9/1/2017          1:34:09PM

7.5     **Passage of Title.** You agree that title to precious metals you purchase shall pass to you and that TREASURE COAST shall be deemed to have delivered such precious metals to you when such precious metals are allocated to you by a member of the LBMA or designated for you, your appointed agent or designee and released, transferred or delivered:  (i) to an office of the United States Postal Service or other common carrier for shipment to you, or (ii) to a pickup vault facility for pick up by you or a packaging and shipping facility for shipment to you (See Section 7.3), or (iii) to a Bank in the U.S. to be held for you. Precious metals delivered to a Bank in the United States for you will be delivered as an undivided share of a fungible lot and held in safekeeping on a fungible basis with the precious metals of other customers. Upon delivery of precious metals to a Bank in the United States, Customer acquires title to an undivided share of the precious metals so held.  Title to precious metals purchased by TREASURE COAST from Customer shall pass to TREASURE COAST upon receipt of the precious metals by TREASURE COAST or its appointed agent or designee for TREASURE COAST.

7.6     **Payment.** Payments to TREASURE COAST may be made by cashier's check drawn on a commercial bank, personal check or bank wire. TREASURE COAST, however, reserves the right to require that Customer pay only by bank wire. TREASURE COAST will treat Customer's payments which are not bank wires as "hold funds" for purposes of delivery of precious metals to Customer. TREASURE COAST will continue to deem such payments as hold funds for 12 business days after it receives Customer's payment. TREASURE COAST may reduce the 12-day holding period on a check upon receipt of a written guarantee of payment from the issuing bank. Customer acknowledges that funds received by TREASURE COAST from Customer will be credited to Customer's account at 5:00 p.m., East Coast Time, on the day of receipt.

8.      **Pricing Policies; Spreads.** TREASURE COAST quotes a price at which it will sell (ask price) and a price at which it will buy (bid price). These prices are established by TREASURE COAST upon its analysis of each precious metal and may change many times during the day. TREASURE COAST bid and ask prices are not tied to prices quoted by any other organization, and there are no established daily limits on the amount those prices may change.

The difference or "spread" between TREASURE COAST bid and ask prices varies. Historically, the spread on bullion prices has usually been about 1-½% to 10%. Spreads on coin products are usually higher than on bullion. During times of high volatility in market prices, spreads can widen substantially. There are no assurances that spreads will remain within a given range.

TREASURE COAST reserves the right to increase or decrease its prices and spreads prospectively, at its sole discretion, and at any time. Customers are encouraged to compare TREASURE COAST prices with those offered by other dealers. Prices of precious metals from other sources are quoted daily in the <u>Wall Street Journal</u>, many local newspapers and on the Internet.

9.      **Buy/Sell Charges (Commissions), Shipping and Handling Charges and Break-Even Price.**

9.1     **Buy/Sell Charges (Commissions).** TREASURE COAST does not currently charge commissions on purchases and sales, but may do so in the future.

9.2     **Shipping and Handling Charges.** TREASURE COAST imposes shipping and handling charges on certain precious metals that it delivers to or on behalf of Customer. These charges change from time to time. Current shipping and handling charges are available upon Customer's request.

Shipments of precious metals to Customers will generally be made from a designated vault packaging and shipping facility. Arrangements may be made for pick up of precious metals from a TREASURE COAST designated pickup vault facility. TREASURE COAST must be advised at least 24 hours in advance for pick up of precious metals. Customer must satisfy all

payments due relative to such precious metals before appointments for pick up may be made. TREASURE COAST will make all appointments and arrangements for pick up with the appropriate facility. All communications to arrange a pick up must be made with TREASURE COAST and not with the vault facility.

A Customer mailing or shipping precious metals to TREASURE COAST bears all risk of loss or non-delivery until the shipment is received and accepted by TREASURE COAST. A Customer wishing to make delivery to TREASURE COAST is required to give at least three days advance notice and make delivery to TREASURE COAST's designated facility. Deliveries of precious metals to TREASURE COAST must be in a form acceptable to TREASURE COAST and may require inspection and assay at the expense of the Customer.

**9.3**   **Break-Even Price**. When you invest in precious metals, it is very important for you to understand and be able to determine your break-even price. The break-even price is the price that your metals must reach in order for you to realize a profit. Basically, the break-even price is the price at which you would be able to liquidate your holdings and recoup all related costs, i.e., your purchase price, buy/sell charges (commissions), and any delivery, interest and storage/service charges.

To illustrate a purchase transaction, assume you purchase one unit of gold bullion (10 ounces) at an ask price of $10,000, or $1,000 per ounce. Your break-even would be a bid price of $1,000 per ounce, plus commissions, and, if you borrow funds, interest and service/storage charges. If you do not use borrowed funds to pay for your purchase and you take personal possession, your break-even bid price per ounce, in this example, is $1,000 (purchase) + a commission of, for example, $100 + a delivery charge of, for example, $10 or a total of $1,110. You would add to this amount any additional commissions and delivery charges that may be imposed at the time you decide to sell your metal.

If you borrow funds to pay for a portion of your purchase price, the factors necessary to calculate your break-even price depend on the duration of the holding time, because of the accrual of interest and service/storage fees. The longer the holding period, the higher the commensurate break-even price. For example, if you were to hold your position for six months, your related costs would include six months of interest and service/storage charges. To illustrate, assume you purchase one unit of gold bullion, as in the above example, but, instead, you borrow $7,000 and remit only $3,000, plus the commission, for a total of $4,000. With an annual interest rate of, for example, 6% and a monthly service/storage fee per unit of $2.50 ($.25 per ounce), your six-month break-even bid price per ounce is $1,000 (purchase) + $100 (commission) + $21 (interest) + $1.50 (storage), or $1,122.50. To this amount you would add any additional commissions that may be imposed at the time you decide to sell your metal, or a delivery charge, if you are taking personal possession.

In all two-way investment markets there is generally a quoted ask price (your purchase price) and a concurrently quoted bid price (your selling price). The ask price is always higher than the bid price. The difference, or spread, between these two simultaneous quotes will vary for each product and at different times.

It is important to keep in mind that, while the spread is not a charge, your metals must rise in price to overcome the amount of the prevailing initial bid/ask spread.

**9.4**   **Adjustment of Charges and Spreads.** TREASURE COAST reserves the right to change prospectively at any time and at its sole discretion the rate of any of its commissions, bid/ask spreads, shipping or handling fees.

10.      **Customer Responsibility, Discretionary Authority and Authorized Customer Orders.**

10.1     **Customer Responsibility; No Discretionary Authority**. You are solely responsible for all purchasing, selling and borrowing decisions for your account. TREASURE COAST neither accepts nor exercises any authority to direct or control purchases or sales in your account; provided, however, that this provision shall not limit in any way TREASURE COAST's rights under Sections 7, 11 and 12 of this Agreement which you should carefully review.

10.2     **Authorized Orders**. Orders must be for specified quantities of precious metals at TREASURE COAST's prevailing quoted price at the time the order is placed (market orders). The TREASURE COAST Order Desk must orally confirm with the Customer all such orders with a tag number. TREASURE COAST will not accept other types of orders.

11.      **Customer Acknowledgment of Risks**. Investments in precious metals involve substantial risk. Historically, there have been periods of varying length during which prices of precious metals have moved adversely to investors' interests. Market prices are volatile and unpredictable and may be affected by a variety of factors including, among others, general economic conditions, political events, monetary policies of various countries, fluctuations in production and demand, stockpiles, speculative activity, transactions and events in futures markets and the degree of concern market participants have about these matters. It is impossible to forecast accurately how or to what degree these or other factors will affect prices.

Investments in precious metals should only be made with discretionary funds and not with monies necessary to cover or produce your day-to-day living or operating expenses.

What is suitable for one customer with a given financial means may not be suitable for the goals or emotional makeup of a second customer of the same means. Before choosing to buy or sell, you must determine in your own mind your ability to understand the transaction and to meet all necessary financial commitments in connection with the transaction. When purchasing precious metals on credit, you must also carefully determine your ability to accept, among other things, that you may be required to provide substantial additional funds to reduce your loan with WORTH GROUP and that some or all of your collateral may be foreclosed upon without advance notice. Investors with limited investment experience, or low incomes or assets, should be particularly sensitive to the risks and financial requirements involved in precious metal investing.

Transactions with TREASURE COAST may involve buy and sell charges ("commissions"), spreads and shipping and handling charges. A sales or use tax or VAT may also be payable. These factors can result in a loss despite favorable price movement if such movement is insufficient to overcome them.

While TREASURE COAST intends to maintain a buy and sell market for the precious metals it deals in, there is no guarantee that TREASURE COAST will continue to do so. In the event that TREASURE COAST is unable or unwilling to quote firm prices at any time, you may be obliged to sell precious metals you own in another market.

TREASURE COAST and its employees are not your agents and owe no fiduciary duty to you.

TREASURE COAST may not be able to contact you at all times that you would like. These and other circumstances may make it impossible at times for TREASURE COAST to stay in close touch with you concerning your account. Therefore, it is your responsibility to monitor your account and to stay in touch with TREASURE COAST and WORTH GROUP, if you have financed your purchase, concerning your account and market conditions.  Do not wait to be contacted.

Any representations that you will be notified or that your precious metal will be sold at particular price levels if the market turns against you are not authorized by TREASURE COAST or WORTH GROUP and may not be relied upon.

Neither TREASURE COAST nor its representatives guarantee, assure or promise future market movement, prices, coin premiums, bid/ask spreads or profits.

TREASURE COAST will rely upon your telephonic instructions and orders. It is the practice of the industry that all purchase and sell orders placed over the telephone are binding contracts and must be honored. Once you place a purchase or sell order which TREASURE COAST accepts, the parties to this Agreement have created a binding contract. The parties may revise the contract only upon mutual consent of both parties.

Your account with TREASURE COAST is self-directed. This means that you are solely responsible for all transaction decisions for your account. Any reliance upon recommendations or suggestions by an TREASURE COAST representative or upon any written material in making your decision to enter into a transaction does not relieve you of your responsibility for that transaction and its outcome. Because you are solely responsible for your account, it is very important that you understand the type of transaction you are considering and that any decisions you make are the same as your intentions. Your verbal authorization to enter a purchase or sale transaction may be recorded to assure both you and TREASURE COAST of the accuracy of your decision. If you ever believe that a transaction has been entered for your account that you have not authorized, or that a transaction you entered into has not been executed by TREASURE COAST, you must immediately notify TREASURE COAST's Compliance Department by phone at (800) 982-6105 and immediately confirm such notification in writing to TREASURE COAST's Compliance Department at 3900 Military Trail Ste 500, JUPITER, FL, 33458. Do not wait to see if market prices move advantageously or disadvantageously before notifying TREASURE COAST management.

If you believe that any representative of TREASURE COAST has made a verbal or written representation that is inconsistent with the terms or risks set forth in this Agreement (e.g., "At its current price, your metal can only go up in value.") or is offensive or unprofessional in nature (e.g., high pressure or unresponsive to requests), notify TREASURE COAST's Compliance Department immediately. If you fail to make the required notification by the tenth business day following the date on which the event first became known to you, you waive all rights to contest such order, matter or omission and your account will stand, as is, as of the end of such business day.

TREASURE COAST and its representatives earn income based upon the volume and type of transactions with customers. In the process of selling precious metals to, and buying precious metals from, you, you should assume that the interests of TREASURE COAST and its representatives conflict with your interests. You must make the final decision as to whether you wish to enter into any particular transaction and should keep the foregoing in mind when making that decision. You are solely responsible for all purchasing, selling and borrowing decisions for your account. This does not, however, limit in any way TREASURE COAST's rights under Sections 7 and 11 of this Agreement.

Tax consequences of transactions with TREASURE COAST are your sole responsibility, and you are responsible for any applicable sales, use or VAT tax.

You hereby warrant and represent that you are a sophisticated investor who understands that precious metals products can be purchased from and sold to competitors of TREASURE COAST and that you have the alternative of doing business with these TREASURE COAST competitors.

9/1/2017          1:34:09PM

In times of highly volatile markets, TREASURE COAST's phone lines may be busy due to the volume of incoming and outgoing calls. It is also possible for telephone lines to fail for reasons beyond TREASURE COAST's control. Because of this, you are advised and will be responsible to have alternative methods to communicate with TREASURE COAST (e.g., e-mail, courier messenger service, etc.) should it become necessary to do so.

If you have any questions, or need any information, call 1-800-982-6105.

**12.   Risk of Decline in Value of Precious Metals**. You acknowledge that all risks of decline in the value of precious metals held by the Bank are yours and not those of the Bank, TREASURE COAST or WORTH GROUP.

**13.   Miscellaneous**.

**13.1   Notices.** All communications shall be sent to TREASURE COAST at 3900 Military Trail Ste 500, JUPITER, FL, 33458 and to Customer at the address set forth following the signatures to this Agreement or such other address subsequently provided to TREASURE COAST by Customer in writing. All communications given by TREASURE COAST to Customer by mail shall be effective 48 hours after deposit in the United States mail, postage prepaid, or upon receipt, whichever is earlier; if hand delivered, when delivered to Customer's address; if telephonic, at the time of such phone conversation or facsimile transmission; or if by e-mail, on the day of transmission.

**13.2   Force Majeure.** In the event of adverse conditions in the marketplace or other factors beyond the control of TREASURE COAST, including, but not limited to, acts of God, national emergencies, adverse governmental actions, or suspension of trading of silver, gold, platinum or palladium futures contracts by U.S. precious metal exchanges, or the delivery of the precious metals underlying such contracts, or the failure or delay of suppliers, the maximum time for delivery of such precious metals may be extended indefinitely during the period of such adverse circumstances. TREASURE COAST will not be responsible for delays or failures in the transmission, receipt or execution of orders, payments, deliveries or information due to the incapacity or failure of computer, transmission or communication facilities which are beyond the control of TREASURE COAST.

**13.3   Entire Agreement**. This Agreement constitutes the entire and whole Agreement between or among its parties and is intended as a complete and exclusive statement of the terms of their agreement. **This Agreement may be amended only upon execution of a subsequent agreement between the parties or upon Customer's failure to object, within 10 days, to modifications contained in subsequent agreements sent to Customer by TREASURE COAST. This Agreement shall supersede any prior written or oral agreements between or among the parties hereto as well as oral representations by any party hereto.**

**13.4   No Partnership, Joint Venture or Agency**. Nothing in this Agreement creates a partnership, joint venture or agency relationship between Customer and TREASURE COAST.

**13.5   Individual Authority of Customer**. Any party signing this Agreement as Customer is authorized to deal fully with the account opened hereunder, for purposes of placing orders, receiving funds or precious metals or otherwise. Any action taken by any such party shall be binding on all other parties with an interest in that account. Each such party shall hold TREASURE COAST harmless for relying hereon. All obligations of Customer under this Agreement are joint and several.

**13.6**     **Electronic Recordation.** Customer agrees that TREASURE COAST may monitor and may lectronically record all or part of any conversation between TREASURE COAST, its employees or agents and Customer or Customer's agents.

**13.7**     **Waiver.** Failure to exercise or delay in exercising any right, power or remedy hereunder by TREASURE COAST shall not operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy of TREASURE COAST hereunder preclude any other or future exercise thereof or the exercise of any other right, power or remedy.

**13.8**     **Indemnification of Bank and Suppliers.** Customer agrees that Bank and TREASURE COAST's Suppliers may act upon any instructions received from TREASURE COAST concerning delivery, transfer of title, sale or disposition of precious metals held by Bank or such Suppliers on Customer's behalf. Customer further agrees to indemnify the Bank and TREASURE COAST from any liability to Customer for actions taken by Bank and such Suppliers in conformity with such instructions.

**13.9**     **Governing Law.** Except as otherwise provided under Section 14 hereof, this Agreement is entered into in accordance with and shall be governed by Florida law; provided that, if any Florida law shall dictate that the laws of another jurisdiction be applied in any proceeding, such Florida law shall be superseded by this paragraph and the remaining laws of Florida shall nonetheless be applied in such proceeding.

**13.10**    **Location of any Dispute Resolution Concerning this Florida Agreement is Florida. You agree that for all purposes you have entered into this Agreement and the making of this Agreement has occurred in Palm Beach County, Florida, notwithstanding any events that may occur outside Palm Beach County, including the manner, timing or location of the delivery of receipt of the acceptance of this Agreement by any party hereto. You also agree that the following events, among others, occurred in Palm Beach County, Florida: the negotiation of this contract will have taken place and have been completed in Palm Beach County, Florida; the contract will be executed in Palm Beach County, Florida; TREASURE COAST is located in Palm Beach County, Florida; all deposits and payments made by you will be delivered to and paid in Palm Beach County, Florida; and the written confirmation of each transaction and all statements of account will be generated in and transmitted from Palm Beach County, Florida.**

**Customer and TREASURE COAST agree that Palm Beach County, Florida is a mutually and reasonably convenient place for any arbitration hearing concerning disputes relating to Customer's transactions with TREASURE COAST or to this Agreement and that all arbitration proceedings subject to this Agreement shall occur before the Judicial Arbitration and Mediation Society ("JAMS") in Palm Beach County, Florida.**

**13.11**    **Assignment.** The provisions of this Agreement shall be continuous and shall inure to the benefit of TREASURE COAST, its successors and assigns, and shall be binding upon Customer and/or the estate, personal representatives, administrators and successors of Customer. TREASURE COAST may assign its rights and delegate its duties as to any or all transactions under this Agreement. Customer may not assert against any such transferee any claim or defense Customer has against TREASURE COAST. Customer may not delegate or assign any obligations or rights hereunder without the prior written consent of a duly authorized officer of TREASURE COAST, and any attempt at such delegation or assignment without such consent shall be void.

**13.12**   **Severability.** In the event that an arbitrator or court determines that any provision of this Agreement is unenforceable, such provision shall be unenforceable and the remainder of this Agreement shall remain binding upon the parties as if such provision was not contained herein.

**13.13**   **Obligations Due in U.S. Currency.** Customer shall pay all obligations owing under this Agreement in            the currency of the United States of America.

**13.14**   **Taxpayer I.D. Number.** Customer certifies that the Social Security Number, or other Federal Taxpayer Identification Number, provided below is correct and that Customer has not been notified by the Internal Revenue Service that he, she or it is a "payee under-reporter" under section 3406(a)(1)(c) of            the Internal Revenue Code.

**13.15**   **Tax Treatment.** TREASURE COAST does not offer advice on the tax treatment of purchasing, selling or financing the purchase of precious metals. Customer must consult with his, her or its personal tax advisor with respect to such matters.

**13.16**   **Cumulative Rights.** The rights, powers and remedies given to TREASURE COAST by this Agreement are cumulative and not exclusive of any other rights, powers and remedies TREASURE COAST may otherwise have. All rights, powers and remedies given to TREASURE COAST by virtue of the Florida Commercial Code or any other law of Florida or any other jurisdiction shall also be available to TREASURE COAST. No forbearance, failure or delay by TREASURE COAST in exercising any right, power or remedy under this Agreement shall be deemed to be a waiver thereof, or of any other right, power or remedy hereunder; nor shall any single or partial exercise of any right, power or remedy hereunder            preclude any other or further exercise thereof or of any other right, power or remedy hereunder. Each right, power and remedy of TREASURE COAST hereunder shall continue in full force and effect until specifically waived in writing by TREASURE COAST.

**13.17**   **Joint and Several Obligations.** All words used herein in the singular shall be deemed to have been used in the plural, and vice versa, as appropriate, and the obligations and undertakings of Customer hereunder shall be joint and several. Neither the discharge of any party to this Agreement for any reason nor any impairment of TREASURE COAST's rights, powers or remedies against one party shall affect the liability or obligations of any other party hereunder. Customer waives any right to require TREASURE COAST to proceed against one party before any other.

**14.**   **Arbitration**.

   **a.**   **Arbitration of Claims.** The parties agree that any and all disputes, claims or controversies arising out of or relating to any transaction between or among them or to the breach, termination, enforcement, interpretation, validity or alleged unconscionability of any part of this Agreement shall be subject to and governed by the Federal Arbitration Act and shall be submitted to final and binding arbitration before JAMS, or its successor, in Palm Beach County, Florida. The parties also agree that this Agreement and the transactions entered into pursuant to it are commercial in nature (i.e., for investment) and do not involve consumer transactions (i.e., transactions entered into for personal, family or household purposes) under JAMS rules, or otherwise.

   **b.**   **Additional Participants in this Agreement to Arbitrate.** All shareholders, officers and directors of TREASURE COAST, and all employees, representatives, agents and affiliates of TREASURE COAST, past, present or future, are beneficiaries of, and participants in, this arbitration agreement. They will have the same rights and obligations under this arbitration agreement as the parties, to the extent that these

arbitration agreement beneficiaries are named as respondents in any dispute, claim or controversy subject to or arising from this Agreement, or could have been so named.

**c.** **Initiation of Arbitration.** Any party may commence the arbitration process by filing a written demand for arbitration with the JAMS office in Palm Beach County, Florida, with a copy to the other party(ies).

**d.** **Arbitration Rules and Fees.** Except as otherwise provided herein, the arbitration shall be conducted in accordance with the provisions of JAMS Comprehensive Arbitration Rules and Procedures in effect at the time of Customer's execution of this Agreement (the "JAMS Rules"). The JAMS Rules shall apply regardless of the amount of the claims or cross claims in the proceeding. Discovery may be taken by the parties only in the manner prescribed by the JAMS Rules. In the discretion of the arbitrator(s), pre-arbitration conferences and hearings may be telephonic.

You can find the JAMS Rules on JAMS' Internet web site: www.jamsadr.com. You can also obtain a copy of the JAMS Rules and information concerning JAMS' administrative and arbitrator fees by calling JAMS national toll free number at 800-352-5267. Currently, arbitrator fees range from about $350 to $600 per hour of service, while some arbitrators charge a per diem fee.. Hearings can be as short as one or two days, but could run five days or longer. Each side will also be charged an initial case management fee (currently $400).

You should review the JAMS rules, and pay attention to the arbitration fees which JAMS will charge the parties, as further discussed below in Section 14.i. You should also be aware that JAMS' fees change from time to time, and that JAMS' fee at the time of any dispute may be higher than at the time that you enter into this Agreement.

**e.** **Arbitrators.** The parties agree that a single arbitrator shall be selected to adjudicate all disputes unless otherwise provided for in this Agreement. The selection and replacement of an arbitrator or arbitrators shall be in accordance with the JAMS Rules, except that: (i) each arbitrator shall be a retired judge of either the Florida Circuit Court] or a United States District Court located in Florida, and (ii) any party may require a panel of three neutral arbitrators.

**f.** **Decision of the Arbitrator(s).** Subject only to a party's right to a JAMS appeal under Subsection 14.g. below, the arbitration shall be final, conclusive and binding on the parties and the award of the arbitrator(s) shall be enforceable in any court of competent jurisdiction.

**g.** **Right to Appeal.** A final decision by one arbitrator may be appealed to JAMS by any party. A final decision by a three-arbitrator panel is final and may not be appealed. Appeals to JAMS shall be subject to the following rules and procedures:

1. The appeal panel will consist of three neutral arbitrators selected in the same manner and subject to the same requirements as under Subsection 14.e. above.

2. The procedure for filing and arguing an appeal is as follows:

   (i) Any party may appeal a final arbitration award issued by one arbitrator. The appeal must be served, in writing, on JAMS and on the opposing party within 14 calendar days after the award becomes final. The appealing party

9/1/2017        1:34:09PM

must specify in writing those parts of the award being appealed and must contain a brief statement of the appeal.

(ii)    Within seven calendar days of the service of the appeal, the opposing party may serve on JAMS and on the opposing party a cross-appeal from any part of the award. The written cross-appeal must specify those parts of the award that the party is cross appealing and must contain a brief statement of the basis for the cross-appeal.

(iii)    The record on appeal will consist of the stenographic or other record of the arbitration hearing and all exhibits, deposition transcripts and affidavits that the arbitrator has accepted into the record. The parties will cooperate with JAMS in compiling the appellate record. No evidence not previously accepted by the arbitrator will be considered by the appellate arbitrators, unless the basis of the appeal is non-acceptance by the arbitrator of certain evidence or unless the appellate arbitrators determine that there is good cause to re-open the record pursuant to the applicable JAMS arbitration rules.

(iv)  The parties may elect to rely on the memoranda or briefs previously submitted to the arbitrators. In the absence of such election, JAMS will obtain the agreement of the parties on a briefing schedule. If no agreement is reached, JAMS will set the briefing schedule. Ordinarily, according to JAMS rules, only opening briefs (of no more than 25 double-spaced pages) will be allowed. The briefs may be in the form of a letter.

(v)    The appellate arbitrators will hear oral argument if a party requests such argument. If there is to be oral argument, JAMS will obtain the agreement of the parties on both the date of such argument and the duration, including the allocation of argument time between the parties. In the absence of agreement, the appellate arbitrators will set the date and duration of the oral argument, including the allocation of time.

3.    Once a party has filed an appeal, JAMS will no longer consider the arbitration award final.

4.    The appellate arbitrators will apply the same standard of review that the first level appellate court in the jurisdiction would apply to an appeal from the trial court decision, were the dispute being heard in state court instead of JAMS. The appellate arbitrators will respect the evidentiary standard set forth in Rule 22(d) of the JAMS Rules. The appellate arbitrators may affirm, reverse or modify an award.

The appellate arbitrators may not remand to the original arbitrator, but may re-open the record in order to review any evidence that had been improperly excluded by the arbitrator or any evidence that is now necessary in light of the appellate arbitrators' interpretation of the relevant substantive law. The appellate arbitrators, absent good cause for an extension, will issue the decision within 21 calendar days of the date of either oral argument, the receipt of the new evidence or receipt of the record and of all briefs, whichever is applicable or later. The appeal panel will make its decision by majority vote. The appellate arbitrators' decision will consist of a concise written explanation unless the parties all agree otherwise.

5.    If a party refuses to participate in the appeal, the appellate arbitrators will maintain jurisdiction over the appeal and will consider the appeal as if all parties were

participating, including retaining the authority to modify any award or element of an award that had previously been entered in favor of the non-participating party, assuming the arbitrators believe that the record, after application of the appropriate standard of appeal, justifies such action.

6.  After the appellate arbitrators have rendered a decision, JAMS will issue the decision by serving copies on the parties. Service will be deemed effective five calendar days after deposit in the U.S. Mail. Upon service of the appellate decision, the award will be final for purposes of judicial review.

**h.  Class Actions**. The parties agree that all matters related to a purported class action by Customer, including, but not limited to, issues of class representation, class certification, class notice and to a decision on the merits shall be determined in arbitration before JAMS pursuant to JAMS' Class Action Procedures then in effect, and by an arbitration panel of three arbitrators selected in accordance with the provisions of Subsection 14.e. of this Agreement.

**i.  Allocation of Costs**.

1.  *Basic Arbitration Costs*. Each side (i.e., claimant(s) on the one hand and respondent(s) on the other) agrees that it will share equally in all JAMS administrative and arbitrator costs if only one arbitrator is used. You may petition the arbitrator to attribute all or a portion of your share of the administrative and arbitrator costs to TREASURE COAST, if you attest to and satisfactorily demonstrate that your financial means are insufficient to meet such costs.

If any party requires a three arbitrator panel, each side shall share equally in JAMS' administrative fees, but the party requiring the three arbitrator panel shall pay all arbitrator fees.

2.  *Costs of Appeal*. The side appealing an arbitrator's award shall be responsible for all costs of the appeal, including the fees of the appellate arbitrators. If both sides appeal, all appellate costs shall be split equally between them.

3.  *Class Actions*. Notwithstanding the foregoing, if Customer brings a class action, the parties agree that each side will share equally all JAMS administrative and arbitrators' fees associated with such arbitration.

**j.  Available Damages and Remedies.** The parties agree that the damages available to any party bringing an action under this Agreement shall be limited to any actual contract damages and tort damages incurred by the party and proximately caused by and resulting from the other party's alleged breach. This paragraph states the exclusive damage remedies available to the parties; and no party to this Agreement shall be entitled to any consequential, punitive or exemplary damages. In all matters, each party shall be responsible for his, her or its own attorney's fees.

If any party unsuccessfully resists arbitration or enforcement of an arbitration award rendered under this Agreement, then all costs, attorneys' fees, and expenses incurred by the other party or parties in connection with any motions compelling arbitration or enforcing the award shall be fully assessed against and paid by the unsuccessful party. Likewise, if the party resisting arbitration is successful, then the party moving to compel arbitration will pay all the successful resisting party's costs and attorney's fees incurred with respect to that motion only.

9/1/2017          1:34:09PM

k. **Waiver of Litigation Rights and Jury Trial.** By signing this Agreement, each party to this Agreement is agreeing to have all claims, disputes and controversies arising out of, or relating to, Customer's transactions with TREASURE COAST or to this Agreement decided by arbitration and is giving up any right to have such claims, controversies and disputes determined in a court of law by            a judge or by a jury, except that court-ordered injunctive relief may be available as set forth above. By signing this Agreement, each party is similarly giving up his, her or its rights to appeal, unless expressly provided for herein. If any party refuses to abide by the terms of this Agreement, such party may be compelled to comply with its terms.

l. **Voluntary Agreement; Revocation.** Each party's agreement to arbitrate is voluntary. Customer may revoke Customer's agreement to arbitrate under Section 14 by written notice delivered to TREASURE COAST at Treasure Coast Bullion Group, Inc., 3900 Military Trail Ste 500, JUPITER, FL, 33458 within 30 days of Customer's first transaction with TREASURE COAST.

15. **Utilizing Other Dealers.** If at any time, you wish to sell your precious metals to a person or dealer other than TREASURE COAST, TREASURE COAST will, upon your written or verbal request, confirm to such person or dealer the quantity and description of the precious metals owned by you and your loan balance owing to WORTH GROUP. Upon payment of that loan balance and any applicable delivery charges, TREASURE COAST will deliver such precious metals to that person or dealer as authorized in writing by you. If such person or dealer wishes to acquire title to precious metals at the Bank, such person or dealer must properly execute and submit a Purchase and Sale Agreement to TREASURE COAST. Upon receipt of such agreement and subject to any security interest WORTH GROUP may have, TREASURE COAST will direct the Bank to transfer title of such precious metals from you to such person or dealer. This service offers you the opportunity to sell your precious metals to another buyer during times when TREASURE COAST is not making a market or when the price offered by another buyer is more attractive than TREASURE COAST's price.

16. **Notification of Statement Errors:** If you think your account statement contains an error, or if you need more information about a transaction on your statement, write TREASURE COAST's Compliance Department, giving the following information: the amount of the suspected error, and a description of the error and an explanation of why you believe there is an error. If you need more information, describe the item you believe is erroneous. In order for you to preserve your rights, TREASURE COAST must hear from you in writing no later than ten (10) days after it sent you the first statement on which the error or problem appeared. TREASURE COAST will acknowledge your letter within 30 days, unless it has corrected the error by then. Within 90 days, TREASURE COAST will either correct the error or explain why it believes the statement is correct. You do not have to pay any amount in question while TREASURE COAST is investigating, but you are still obligated to pay the other parts of your statement that are not in question. If TREASURE COAST did not make a mistake, you are obligated to pay all amounts charged to your account when due.

**THE UNDERSIGNED CUSTOMER AFFIRMS HIS, HER OR ITS UNDERSTANDINNG AND ACKNOWLEDGES THAT:**

a. I am of legal age and/or legally competent to enter into this Agreement.

b. All of my transactions with TREASURE COAST will be for investment or other commercial purposes and not for any personal, family or household purposes.

c. The purchase of precious metals, especially on credit, involves a high degree of risk and is not suitable for all persons. (See Sections 3, 9.3, 11 and 12.)

d.   Required funds must be sent to TREASURE COAST within 24 hours of the transaction and received by TREASURE COAST within two business days or such shorter period as may be imposed by TREASURE COAST. (See Sec. 7.1)

e.   I will immediately notify TREASURE COAST's Compliance Department, in writing, if any statement made to me by a TREASURE COAST representative is inconsistent with the risks and terms set forth in this Agreement.

f.   I will not convey any discretionary authority concerning my account to TREASURE COAST or its representatives. This means that I make and that I am solely responsible for all trading decisions for my account. If I believe that a transaction has not been authorized by me, or has not been executed by TREASURE COAST as I directed, I will immediately notify TREASURE COAST's Compliance Department. I waive all rights to contest such transaction or omission if I fail to make such notification within ten (10) business days after such event first becomes known to me. (See Sec. 10.1 and Sec. 16.)

g.   **There are numerous factors which affect precious metal prices and it is impossible to forecast accurately how or to what degree such factors will affect prices. I understand that I will lose money unless the value of the precious metals I purchase or borrow moves sufficiently in price to compensate me for commissions, bid/ask spreads, interest and any other applicable charges.** (See Secs. 9.3, 11 and 12.)

h.   I have determined in my own mind that I am financially, intellectually and emotionally suitable to enter into the transactions which are the subject of this Agreement and able to accept the risks and to meet the financial commitments being made. (See Sec. 11.)

i.   I understand there are no assurances or guarantees by TREASURE COAST or its representatives as to the future value of the precious metals I purchase. (See Sec. 11.)

j.   TREASURE COAST may monitor and electronically record any conversations between me or my agents and TREASURE COAST, its employees or agents. (See Sec. 13.6.)

k.   Transactions subject to this Agreement are not subject to regulation by the Commodity Futures Trading Commission or the National Futures Association. TREASURE COAST is not a fiduciary and does not owe its customers any fiduciary duty.

l.   In purchases of precious metals on credit, it is possible for me to lose substantially more than the amount of the payments or deposits I have made. Borrowing money to acquire precious metals materially increases the risk of the investment. (See Secs. 9.3 and 11.)

m.   At times, I may be called upon to deposit substantial additional collateral with WORTH GROUP, INC. to secure my obligations to WORTH GROUP, INC. It is possible for some or all of the Collateral in my account to be foreclosed upon without prior notice to me. (See Sec. 11.)

n.   TREASURE COAST will rely upon instructions and orders given by me over the telephone. It is the practice of the industry that such orders and instructions are binding. (See Sec. 11.)

9/1/2017        1:34:09PM

**o.**   In times of highly volatile markets, TREASURE COAST's phone lines may be busy due to the volume of calls. It is also possible for telephone lines to fail for reasons beyond TREASURE COAST's control. Because of this, Customer is advised and will be responsible to have alternative methods to communicate with TREASURE COAST (e.g., e-mail, courier messenger service, etc.) should it become necessary to do so. (See Sec. 11.)

**p.**   It is my responsibility to monitor my account and to stay in touch with TREASURE COAST concerning my account. <u>I understand that I should not wait to be contacted.</u> (See Sec. 11.) An representations that I will be notified or that my collateral will be liquidated, at particular price levels, are not authorized by TREASURE COAST and may not be relied upon by Customer. (See Sec. 11.)

**q.**   **If neither the Customer nor its customer is taking physical delivery of precious metals purchased without using financing, TREASURE COAST may also cover the purchase with offsetting cash forward or other contracts with one or more of its suppliers until physical delivery is required. (See Sec. 7.3.)**

**r.**   By signing this Agreement, I authorize TREASURE COAST and its representatives to call me at any telephone number and to send e-mails to any e-mail address that I have provided to TREASURE COAST concerning matters regarding my account with TREASURE COAST and for promotional purposes. Such authorization shall continue until such time as I notify TREASURE COAST in writing of the revocation of such authorization or of a change in its terms.

**s.**   All risks of decline in the value of my precious metals held by the Bank are mine and not those of the Bank, TREASURE COAST or WORTH GROUP. (See Sec. 12.)

**t.**   **Customer has carefully read and understands the foregoing**. I understand that I am agreeing to submit all disputes, claims and controversies arising out of, or relating to, my transactions with TREASURE COAST or this Agreement to binding arbitration before JAMS, which is a private dispute resolution procedure, as set forth in Section 14 above. I understand that by agreeing thereto, I am also agreeing to pay JAMS administrative fees and arbitrators fees according to the terms of Subsection 14.d. and to give up my rights to a jury trial of any claims. (See Section 14.k.)

**u.**   I (We) understand that I (We) may rescind this Agreement within three (3) business days (Saturdays included of receiving a signed written confirmation. To cancel, I (We) must contact TREASURE COAST office in writing at Treasure Coast Bullion Group, Inc., at 3900 Military Trail Ste 500, JUPITER, FL, 33458. I(We) understand that all orders (purchase or sale) placed by me(us) with Treasure Coast Bullion Group, Inc., after my(our) initial rescission period has lapsed, are final and therefore are not subject to cancellation or modification, unless agreed to in writing by both me and Treasure Coast Bullion Group, Inc..

**You are not obligated to pay any monies unless you sign this contract and return it to the commercial telephone seller.**

**Company TC#** __4455__   **Salesman TP#** _____25970_ **Salesman Name**_____ ___Matt Kehoe__

_Paul Thompson_ _____
Customer Name(s) (Print)

**X** _Paul Thompson_ _____
Customer Signature

Date: __09/01/2017__ _____

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
_____
Social Security or other Federal Taxpayer
Identification Number

**X**_____
Co-Signer Signature

Date:_____

_____
Co-Signer Social Security or other Federal
Taxpayer Identification Number

702-363-1311
_____
Home Telephone          Business Telephone

10401 W. CHARLESTON BLVD. UNIT A-312
_____
Address

_____
Cell Telephone

LAS VEGAS, NEVADA, 89135   UNITED STAT
_____
City                State      Zip

pst3438@gmail.com
_____
Email Address

**X** _ Single Owner
____ _Limited Liability Company_
____ _Joint Tenants with Right of Survivorship_

_____
_Account No._

____ _Trustee For (Name of Trust, Pension or_
_Profit Sharing Plan)_
_[Name:_____ ]_
____ _Tenants in Common_
____ _Corporation_
____ _Partnership_
____ _Other:_____ ._

_Treasure Coast Bullion Group, Inc. - For Official Use_
_Only_
     Michael Young
_By:_____

     9/1/2017   1:34:08PM
_Date:_____

# ADDITIONAL INFORMATION

**AML POLICY:** To comply with Federal ANTI MONEY LAUNDERING laws, we ask that you provide us at the time you open your account with a current government-issued photo-bearing identification with current residential address (e.g., driver's license, passport, state or national identity card). If you are a corporation, partnership, limited liability company or trust, we ask that you provide us with a certified copy of your articles or certificate of incorporation or organization or partnership or trust agreement, as appropriate, and a certificate of good standing or active status issued by the jurisdiction of formation or incorporation. We also ask that you complete the attached one page form.

**PRIVACY POLICY:** Maintaining the privacy of your personal information is of the utmost importance to us. In order to provide services to you, we must maintain certain information that we collect from account applications or other forms that you complete, transactions that you conduct and communications with our affiliates and us. It is our policy not to disclose your personal information to third parties except as permitted by law or requested by you. We also restrict access to nonpublic personal information to those employees who need to know that information to provide service to you. You are welcome to contact us at 1-800-982-6105 if you have any questions regarding our Privacy Policy. We reserve the right to revise our policy and will provide you notice of any revisions.

**SENDING FUNDS TO TREASURE COAST:**

Make checks or wires payable to Treasure Coast Bullion Group, Inc. for purchases of precious metals.  Be sure to reference your account number and the name of account holder on the back of the check or in the wire.

<u>Wire to:</u>

Please contact TREASURE COAST directly for wiring instructions.

<u>Mail to:</u>

Treasure Coast Bullion Group, Inc.
3900 Military Trail Ste 500
JUPITER, FL, 33458

If you have any questions please contact us at 1-800-982-6105.

9/1/2017          1:34:09PM

**Treasure Coast Bullion Group, Inc.**
**3900 Military Trail Ste 500JUPITER, FL, 33458**
**PHONE NO. 1-800-982-6105; FAX: 1-561-515-2681**

**Individual Customer Profile**

**Personal Information:**

Customer Name:     Paul Thompson

Residential Address:     10401 W. CHARLESTON BLVD. UNIT A-312
Street [P.O. Box *not* acceptable]

LAS VEGAS, NEVADA, 89135   UNITED STATES
City, State    Zip    Country

Check One:  →    ☒ U.S. Citizen       ☐ Non-Resident Alien       ☐ Resident Alien

Nationality: _____   Driver's License No., Passport or
Alien I.D. Card: ____1601604802____;

Employer's Name: _____   *Please provide photocopy or electronic scan of such I.D.*

Position: _____   Marital Status:    Married

Business Telephone: _____   Years Employed: _____

Cell Phone: _____   Home Telephone:    702-363-1311

Email:     pst3438@gmail.com   Fax Number: _____

Date of Birth:    03/24/1934   Social Security No:    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

Co-Signer   Co-Signer
Date of Birth: _____   Social Security No: _____

---

**Information for Corporations, Partnerships, Limited Liability Companies & Trusts:**

Name: _____   State of Organization: _____

Address of Principal  Place of Business: _____
Street
_____,_____
City    State    ZiP    Country

Names of Individual(s) with authority or control over the entity, including the entity:

1. _____

2. _____

3. _____

---

I hereby warrant that the foregoing answers are true and correct to the best of my knowledge and that I have not been instructed by anyone to misrepresent any fact herein. TREASURE COAST may rely on the above information for determining whether to buy or sell precious metals from or to me or to extend me any financing.

Signature:    Paul Thompson          Date:    09/01/2017

Signature: _____          Date: _____

*This document was Electronically Signed on 9/1/2017  1:08:00PM from IP Address 68.104.12.105*

Exhibit 10

**How to open Loan Account with WORTH**

Enclosed you will find the necessary documents to open a loan account with WORTH GROUP, INC.   Please read it and then sign, complete and return the Account Agreement as instructed below.   You may access this Agreement through the Worth Group, Inc. website.

A.   **Loan, Security and Storage Agreement**.   Be sure to include name(s), address(es), social security or tax identification number(s), telephone number(s), e-mail address(es) and indicate account type.  Have all parties sign and date.

B.   **Authorization to Transfer Funds**.   Allows excess funds to be transferred from one account you hold with WORTH to another without further authorization.

---

**ATTENTION**

To complete these agreements each borrower must:

1.   Sign and complete pages 10 through 14.

2.   Provide his/her/its Social Security Number or other Federal Tax ID Number.

3.   Provide a complete Address and e-mail address.

4.   Trust,  Partnership,  Limited Liability  Company or  Corporate Account - must enclose complete copy of Trust Agreement, Partnership Agreement, Limited Liability Company Agreement or Corporate Resolution.

5.   Please sign and complete the Commision and Administrative Charges and Customer Profile.

**ONLY COMPLETE ACCOUNT DOCUMENTS WILL BE PROCESSED**

---

Signing these agreements in no way obligates you to do business with WORTH.

Return the complete Agreements in the business envelope provided.

Complete Loan Agreements must be returned to WORTH.  Individual signature pages will not be accepted.

**Any deletions from, additions to or cutting or mutilation of any portion of this Agreement will render the Agreement unacceptable.**

**Loan, Security and Storage Agreement**

**1.** **Parties.** This Agreement is entered into between Worth Group, Inc. ("WORTH") and the borrower(s) ("Borrower" or "you") signing below.

**2.** **Financing.**

**2.1** **Terms and Conditions.** At your request, WORTH may extend financing to you from time to time under the terms of this Agreement. Each such extension of financing by Worth to you shall be referred to herein as a "Loan," and all such extensions of financing shall be collectively referred to herein as the "Loans." Should WORTH make Loans to you hereunder, you shall execute a promissory note (the "Promissory Note") in form and substance satisfactory to WORTH to evidence the Loans. You agree that WORTH is authorized to record in its books and records the date and amount of the Loans made by WORTH; provided that the Lender's failure to record such Loans or the amounts paid thereon on its books shall not limit or otherwise affect the obligations of the Borrower hereunder or under the Loan Agreement to repay the principal of and interest on the Loans. WORTH shall send you a Monthly Statement setting forth the amount of the Loans then outstanding. The amount of Loans reflected in your Monthly Statement shall be deemed conclusive and binding upon you in the absence of manifest error.

WORTH will impose interest charges (sometimes referred to as "finance charges") on the outstanding and unpaid amount of each Loan. Interest (finance) charges are calculated by multiplying WORTH's prevailing periodic daily interest percentage rate (WORTH's annual interest percentage rate divided by 365) by the outstanding and unpaid amount of each Loan and by the number of applicable days. Interest charges are made to the account on the last day of each calendar month and at such other times as there is activity in the account. Activity in the account is any change in the balance of any Loan (increase or decrease) or the making of a new Loan. The interest rate charged by WORTH will be a variable rate over the prime rate, but will not exceed the prime rate by more than 8% per annum. The term "prime rate" means the current prime rate as correctly published in the U.S. Edition of the Wall Street Journal. WORTH may change its interest rate at any time.

Interest rates in effect are stated by WORTH on your Monthly Statement and in other documents used by WORTH from time to time to notify you of such rates. WORTH's determination of interest rates and calculation of interest owed shall be conclusive and binding upon you absent manifest error. The failure by WORTH to issue a Monthly Statement shall not limit or otherwise affect your obligations hereunder to repay the principal of and interest on the Loans

You promise to repay the Loans at WORTH'S office in Florida on demand, or if no demand, five years from the date of this Agreement, together with interest thereon

change from time to time. Your failure to make such payments as required shall constitute a default; and WORTH shall have the right to dispose of all collateral and security provided by you or on your behalf, as provided in Section 13 hereof, and apply such proceeds against the obligations due it hereunder, including the Loans. Such right shall be without limitation to the value of the collateral and security and any other remedies granted to WORTH by this Agreement or otherwise by law.

Your loan balance may be paid in full by you any time without penalty.

Loans for a purchase on your behalf will be debited to your loan balance on the day of such purchase. In the event of any dispute between us regarding the allowable level of interest rates, such dispute shall be submitted to arbitration pursuant to Section 35 of this Agreement and if the Arbitrator determines that the interest rates exceed the maximum allowable rates, the Arbitrator will reduce the interest rates under this Agreement to the legal maximum rates.

You represent that all Loans and other advances by WORTH to you will be used for the purchase of precious metals for investment or for other commercial purposes and not for any personal, family or household purposes.

You hereby waive diligence, presentment, protest, demand and notice of every kind and (to the full extent permitted by law) the right to plead any statute of limitations as a defense to any demand pursuant to this Agreement or in connection with any security.

**3.** **Equity Obligations.** You must keep your obligations to WORTH at all times fully secured, to the satisfaction of WORTH, and to make additional cash payments on your account or deposit additional precious metal as security, should the value of the security for such obligations at any time suffer a decline or for any reason be at any time insufficient to secure such obligations to the satisfaction of WORTH in its sole discretion.

**Investments in precious metals involve a high degree of risk. The degree of risk is significantly increased when such investments are made with borrowed funds. You should anticipate WORTH calling upon you from time to time to reduce your Loan balance. If you do not meet WORTH's call with the designated payment amount and within the time that WORTH specifies (which may be immediately), WORTH may in its sole discretion sell the collateral pledged as security and apply the proceeds to the Loans. WORTH also has the right in its sole discretion to make such a sale without making a request that the you reduce the outstanding balance due WORTH or before the deadline for you to respond to a request for funds by WORTH. Similarly, WORTH also has the right in its sole discretion to require you to increase your**

**collateral securing your obligations to WORTH to be inadequate.**

In times of highly volatile markets, WORTH phone lines may be busy due to the volume of incoming and outgoing calls. It is also possible for telephone lines to fail for reasons beyond WORTH's control. Because of this, you are advised and will be responsible to have alternative methods to communicate with WORTH (e.g., e-mail, courier messenger service, etc.) should it become necessary to do so.

**4.      Payment**. You may make payments to WORTH by cashier's check drawn on a commercial bank, personal check or bank wire. WORTH, however, reserves the right to require you to pay only by bank wire. WORTH will deem payments which are not bank wires to be "hold funds" for 12 business days after receipt by WORTH. WORTH may reduce the 12 day holding period for checks upon receipt of a written guarantee of payment from the issuing bank. You acknowledge that WORTH will credit received funds to your account at 5:00 p.m., East Coast Time, on the day of receipt.

**5.      Collection Costs.** You promise to pay all costs of collection, including reasonable attorneys' fees, incurred in the collection of amounts due under this Agreement.

**6.      Security Interest.**

**6.1      The Bank.** On all transactions financed pursuant to this Agreement, your purchases of precious metals will be delivered to a depository (referred to herein as the "Bank") to be held for you, subject to the security interest granted by you in Section 6.2 below. The Bank shall be selected by WORTH from time to time. By effecting any transaction pursuant to this Agreement, you also select the Bank to be your depository for the purpose of (a) receiving any delivery of precious metals and (b) holding such precious metals on your behalf, in each case subject to Section 6.2. Any precious metals you purchase in connection with this Agreement shall be delivered to the Bank within 28 days of their purchase.

**6.2      Security Interest.** As security for the satisfaction of all your obligations to WORTH now or hereafter existing (the "Indebtedness"), you hereby grant to WORTH a security interest in: (a) all precious metals belonging to you and held for you by WORTH or the Bank; (b) all precious metals or contractual rights in which you have an interest which shall hereafter be delivered to or come into the possession, custody or control of the Bank or WORTH in any manner or for any purpose (the assets described in clause (a) and clause (b) of this Section 6 is referred to herein as the "Metal Collateral"); (c) all cash deposited with WORTH by or for you; and (d) all your accounts and debts with WORTH or the Bank. Bank may hold or transfer such property (the assets described in clause (a) through Clause (d) of this Section 6, including, without limitation, the Metal Collateral, are collectively referred to as, the "Collateral") to any facility within its control. WORTH may assign to one or more of its suppliers or financing sources (each an "Assignee") any or all of your obligations to WORTH and all security interests and other rights WORTH may have in any

are held for you by the Bank, including any or all Collateral. By executing this Agreement, you consent to any such assignment. You also acknowledge and agree that, notwithstanding any such assignment, the Collateral will continue to be held for you by the Bank or by such other depository designated by the Assignee, in each case subject to the security interest granted pursuant to this Section 6. Upon the payment of all outstanding Indebtedness, you shall have the right to transfer any assets formerly constituting Collateral from the Bank or such other depository designated by the Assignee to any depository of your choosing pursuant to the instruction letter you have executed in connection herewith.

You hereby acknowledge that WORTH and/or the Bank hold the Collateral for purposes of perfection by possession, including under Section 9-313 of the Uniform Commercial Code. Nevertheless, you hereby authorize WORTH and any successor thereof, including any and all assignees, to file such financing statements, amended financing statements, security agreements, notices of lien and other similar documents as may be necessary or desirable to perfect or maintain the perfection by filing of the security interest granted herein.

If you are an individual, you hereby represent and warrant that the address reflected on the Individual Borrower Profile attached hereto is your principal residence and agree to update such information upon any change. If you are a registered organization, you hereby represent and warrant that your state of organization and address of principal place of business on the Information of Corporations, Partnerships, Limited Liability Companies & Trusts attached hereto is true and correct and you further agree to update such information upon any change. You agree to provide such other information as may be necessary or desirable to perfect or maintain the perfection of the security interest granted herein by filing.

**7.      WORTH Rights and Remedies**. Upon default under this Agreement, WORTH shall have, in addition to all other rights and remedies conferred on WORTH hereby, all rights and remedies of a secured party under the Florida Uniform Commercial Code.

**8.      Acceleration Upon Default**. Upon default under this Agreement, WORTH may, at its election, declare any or all of your obligations immediately due and payable.

**9.      Risk of Decline in Value of Precious Metals**. You acknowledge that all risks of decline in the value of precious metals held by the Bank are yours and not those of Bank or WORTH.

**10.      Service/Storage Charges.** A monthly service/storage charge will be imposed on your account at the close of business on the last day of each month based on the units of precious metals in your account at the Bank that are designated for delivery to or stored by Bank at such time. The unit charges are applicable as of month-end, irrespective of the number of days the precious metals are held in your account. WORTH reserves the right to change prospectively at any time and at its sole discretion any of its service/storage fees. Current service and storage charges are available upon your request.

11.    **Protection of Security Interest.** You hereby authorize WORTH to take any actions it believes necessary to protect or preserve its security interest in the Collateral. WORTH may file this Agreement and such other documents as WORTH may deem appropriate, which you agree to provide upon WORTH's request, with the appropriate authorities as necessary to perfect WORTH's security interest under this Agreement. Until the Indebtedness is repaid in full, you shall not sell, encumber or otherwise transfer any interest in the Collateral or permit to exist any encumbrance of any kind on the Collateral other than other than WORTH's or the Bank's security interest.

12.    **Attorneys' Fees.** All advances and expenses, including reasonable attorneys' fees, which WORTH incurs in exercising any right, power or remedy conferred by this Agreement or in its enforcement, shall become a part of the Indebtedness and shall be paid to WORTH by you immediately upon demand.

13.    **Events of Default and Foreclosure.** At the option of WORTH and without necessity of demand or notice, all or any part of the Indebtedness shall immediately become due and payable upon the happening of any of the following events ("Events of Default"): (a) your failure to meet or perform any of the terms or provisions of this Agreement (including, without limitation, a default in payment of any Loan (including, without limitation, interest charges thereon) or any indebtedness to WORTH when due); (b) your equity in the Collateral falls below WORTH's prevailing equity call level; or (c) WORTH determines at any time and in WORTH's sole discretion that your Indebtedness is insufficiently secured. **In the event of an Event of Default, WORTH shall have the right, but not the obligation, to foreclose upon all or any part of the Collateral. Foreclosure may be effected at any time of the day or night, on regular business days or otherwise, without prior notice, even though: (1) WORTH has not made a demand for additional security or repayment; (2) such a demand is outstanding and has not yet been met; or (3) your equity in the Collateral has subsequently risen above WORTH's minimum permissible level due to an increase in the value of the Collateral. You agree to independently monitor the world markets in all precious metals which you hold and to closely monitor your equity in the Collateral to reduce the likelihood of foreclosure. You acknowledge the increased risk of foreclosure if you fail to monitor your equity. WORTH reserves the right to change its equity call level at its sole discretion and at any time.**

14.    **Rights and Remedies.** In the event of your failure to satisfy any Indebtedness when due, or upon the happening of any Event of Default as previously specified, or upon demand by any Bank, WORTH may, at any time, at its election, apply, set off, collect or sell, in one or more sales, with or without any previous demands, notice or advertisement, the whole or any part of the Collateral, in such order as WORTH may elect. Any such sale may be made either at public or private sale at WORTH's place of business or elsewhere, either for cash or upon credit or for future delivery, at such price as WORTH may deem fair. WORTH or WORTH may be a bidder on or the purchaser

of any or all Collateral so sold, whether at public or private sale, and hold the same thereafter in its own right free from any claim of yours or right of redemption. In such circumstances, WORTH is also entitled to take possession and control of any proceeds resulting from the sale or other disposition of any of the Collateral. You hereby appoint WORTH your Attorney-in-Fact to make any transfer of title of the Collateral permitted by this Agreement and to deliver all instruments to accomplish such transfer. The Bank may act upon instructions from WORTH concerning the sale or other disposition of the Collateral. You shall indemnify Bank from any liability to you for actions taken by the Bank in conformity with such instructions. You agree that the precious metals comprising the Collateral may decline or increase speedily in value and are of the type customarily sold on a recognized market and that WORTH may treat and deal with such precious metals in any fashion it deems appropriate, in its absolute discretion, to preserve its security interest in such precious metals. Any sale hereunder may be conducted by any officer or agent of WORTH.

15.    **Waiver.** You hereby waive any right to require WORTH to (a) proceed against any particular person, (b) proceed against or exhaust any part of the Collateral, or (c) pursue any other remedy in WORTH's power prior to or as a condition of proceeding against you or against any part of the Collateral. You further waive any defense arising by reason of any disability or other defense you or any other person may have. Until all Indebtedness shall have been paid or otherwise satisfied in full, you shall have no right of subrogation and you waive any benefit and/or any right to participate in any Collateral or security whatsoever now or hereafter held by WORTH. You authorize WORTH without notice or demand and without affecting your liability hereunder or on the Indebtedness to: (a) change the time for payment or otherwise change the terms of the Indebtedness, or any part thereof, including the rate of interest thereon; (b) take and hold security, other than the Collateral, for the payment of the Indebtedness or any part thereof, and exchange, enforce, waive and release the Collateral, or any part thereof, or any such security, and (c) release or substitute Borrower, or any endorser or guarantor of the Indebtedness, or any part thereof. No failure to exercise or delay in exercising any right, power or remedy hereunder by WORTH shall not operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy of WORTH hereunder preclude

any other or future exercise thereof or the exercise of any other right, power or remedy of WORTH.

16.    **Release of Collateral.** WORTH may at any time release all or part of the Collateral to any Borrower hereunder. WORTH shall be discharged from any liability to any other Borrower for the Collateral so released.

17.    **Deficiency of Collateral; Recourse Against Separate Property.** Each Borrower shall be jointly and severally liable to WORTH for any deficiency remaining after the Collateral is exhausted and expressly agrees that recourse may be had against his or her separate property for all of the Indebtedness.

18. **Assignment**. The provisions of this Agreement shall be continuous and shall inure to the benefit of WORTH, its successors and assigns, and shall be binding upon you and/or your estate, personal representatives, administrators and successors. WORTH may assign its rights and delegate its duties as to any or all transactions under this Agreement. Upon transfer of all or any part of the Indebtedness, WORTH may transfer its security interest in all or any part of the Collateral and shall be fully discharged from all liability with respect to the Collateral so transferred, and the transferee shall be vested with all the rights and powers of WORTH with respect to such Collateral. You may not assert against any such transferee any claim or defense you have against WORTH. WORTH may, at any time, without notice to you, assign all or any part of its rights and privileges under this Agreement to another party ("Lender") in exchange for financing. In the event WORTH assigns its security interest under this Agreement in the Collateral to Lender, you agree that Lender may, at any time, at its election and sole discretion, without notice or demand to any Borrower sell, apply, set off or otherwise liquidate the Collateral. You further agree to hold Lender harmless from any claims asserted by you arising out of any such sale, liquidation or set off of the Collateral by Lender. You may not delegate or assign any obligations or rights hereunder without the prior written consent of a duly authorized officer of WORTH, and any attempt at such delegation or assignment without such consent shall be void.

19. **Entire Agreement.** This Agreement constitutes the entire and whole Agreement between or among its parties and is intended as a complete and exclusive statement of the terms of their agreement. This Agreement may be amended only upon execution of a subsequent agreement between the parties or upon Borrower's failure to object, within 10 days, to modifications contained in subsequent agreements sent to Borrower by WORTH. This Agreement shall supersede any prior written or oral agreements between or among the parties hereto as well as oral representations by any party hereto.

20. **Indemnification of Bank and Suppliers.** You agree that Bank and it suppliers and affiliates may act upon any instructions received from WORTH concerning delivery, transfer of title, sale or disposition of precious metals held by Bank or such suppliers on your behalf. You further agree to indemnify the Bank and WORTH from          a n o t h e r entity, including an individual, partnership or corporation, or transferring any Collateral to Worth, WORTH or the Bank from any such entity (each a "Transfer"), you agree to indemnify, defend and hold harmless WORTH and the Bank, as the case may be, and all of their respective agents for any damages, losses, liabilities, penalties, fines, assessments, charges, costs, taxes, disbursements or expenditures ("Losses") to the extent that such Losses relate to, arise out of or result from (a) any such Transfer, (b) any action or omission taken by you (or not taken by you) or any of your agents on or before the date of this Agreement in connection with or related to any previous account(s) held in your name or in the name of any of your representatives and agents and (c) any other Losses of any kind related to you or your

trading activity arising prior to the date hereof. If any of WORTH or the Bank, as the case may be, provides you with notice of any Losses subject to this Section, you shall promptly assume and conduct the defense of any claims related to such Losses; provided that (1) any counsel shall be acceptable to the indemnified parties and (2) you shall not enter into any settlement or judgment in respect of such Losses without the consent of the indemnified parties.

21. **Severability**. In the event that an arbitrator or court determines that any provision of this Agreement is unenforceable, such provision shall be unenforceable and the remainder of this Agreement shall remain binding upon the parties as if such provision was not contained herein.

22. **Obligations Due in U.S. Currency**. All obligations owing under this Agreement shall be paid in the currency of the United States of America.

23. **Taxpayer I.D. Number**. You certify that the Social Security Number, or other Federal Taxpayer Identification Number, provided below is correct and that you have not been notified by the Internal Revenue Service that you are a "payee under-reporter" under section 3406(a)(1)(c) of the Internal Revenue Code.

24. **Tax Treatment**. WORTH does not offer advice on the tax treatment of purchasing, selling or financing the purchase of precious metals. You must consult with your personal tax advisor with respect to such matters.

25. **Continuing Agreement**. This is a continuing agreement and all the rights, powers, and remedies hereunder shall apply to all of your past, present and future indebtedness to WORTH. This Agreement may be revoked only upon written notice to WORTH given by each Borrower signing this Agreement and then only if at that time there is no Indebtedness outstanding.

26. **Cumulative Rights.** The rights, powers and remedies given to WORTH by this Agreement are cumulative and not exclusive of any other rights, powers and remedies WORTH may otherwise have. All rights, powers and remedies given to WORTH by virtue of the Florida Uniform Commercial Code or any other law of Florida or any other jurisdiction shall also be available to WORTH. No forbearance, failure or delay by WORTH in exercising any right, power or remedy under this Agreement shall be

deemed to be a waiver thereof, or of any other right, power or remedy hereunder; nor shall any single or partial exercise of any right, power or remedy hereunder preclude any other further exercise thereof or of any other right, power or remedy hereunder. Each right, power and remedy of WORTH hereunder shall continue in full force and effect until specifically waived in writing by WORTH.

27. **Joint and Several Obligations.** All words used herein in the singular shall be deemed to have been used in the plural, and vice versa, as appropriate, and your obligations and undertakings hereunder shall be joint and several. Neither the discharge of any party to this Agreement for any reason other than payment or other satisfaction in full of all Indebtedness, nor any extension, forbearance,

change in the annual percentage interest rate, or acceptance, release or substitution of Collateral or any impairment of WORTH's rights, powers or remedies against one party shall affect the liability or obligations of any other party hereunder. Each Borrower waives any right to require WORTH to proceed against one Borrower before any other.

28.     **No Partnership, Joint Venture or Agency.**     Nothing in this Agreement creates a partnership, joint venture or agency relationship between any Borrower and WORTH.

29.     **Individual Authority of Borrower.**     Any party signing this Agreement as Borrower is authorized to deal fully with any financing provided or Collateral hereunder, for purposes of receiving funds or precious metals or otherwise. Any action taken by any such party shall be binding on all other Borrowers. Each Borrower shall hold WORTH harmless for relying hereon. All obligations of the Borrowers under this Agreement are joint and several.

30.     **Electronic Recordation.**     Borrower agrees that WORTH may monitor and may electronically record all or part of any conversation between WORTH, its employees or agents and Borrower or Borrower's agents.

31.     **Notices.**     All communications shall be sent to WORTH at 3900 Military Trail, Suite 600, Jupiter, Florida 33458 and to Borrower at the address set forth following the signatures to this Agreement or such other address subsequently provided to WORTH by Borrower in writing. All communications given by WORTH to Borrower by mail shall be effective 48 hours after deposit in the United States mail, postage prepaid, or upon receipt, whichever is earlier; if hand delivered, when delivered to Borrower's address; if telephonic, at the time of such phone conversation or facsimile transmission; or if by e-mail, on the day of transmission.

33.     **Governing Law.**     Except as otherwise provided under Section 35 hereof, this Agreement is entered into in accordance with and shall be governed by Florida law; provided that, if any Florida law shall dictate that the laws of another jurisdiction be applied in any proceeding, such Florida law shall be superseded by this paragraph and the remaining laws of Florida shall nonetheless be applied in such proceeding.

34.     **Location of any Dispute Resolution Concerning this Florida Agreement is Florida. You agree that for all purposes you have entered into this Agreement and the making of this Agreement has occurred in Palm Beach County, Florida, notwithstanding any events that may occur outside Palm Beach County, including the manner, timing or location of the delivery or receipt of the acceptance of this Agreement by any party hereto. You also agree that the following events, among others, occurred in Palm Beach County, Florida: the negotiation of this contract will have taken place and have been completed in Palm Beach County, Florida; the contract will be executed in Palm Beach County, Florida; WORTH is located in Palm Beach County, Florida; all deposits and payments made by Borrower will be delivered to and paid in**

**Palm Beach County, Florida; all loans made by WORTH will be made from and paid in Palm Beach County, Florida; and the written confirmation of each transaction and all statements of account will be generated in and transmitted from Palm Beach County, Florida.**

**You and WORTH agree that Palm Beach County, Florida is a mutually and reasonably convenient place for any arbitration hearing concerning disputes relating to your transactions with WORTH or to this Agreement and that all arbitration proceedings subject to this Agreement shall occur before the Judicial Arbitration and Mediation Society ("JAMS") in Palm Beach County, Florida.**

35.     Arbitration.

a.     **Arbitration of Claims.**     The parties agree that any and all disputes, claims or controversies arising out of or relating to any transaction between or among them or to the breach, termination, enforcement, interpretation, validity or alleged unconscionability of any part of this Agreement shall be subject to and governed by the Federal Arbitration Act and shall be submitted to final and binding arbitration before JAMS, or its successor, in Palm Beach County, Florida. The parties also agree that this Agreement and the transactions entered into pursuant to it are commercial in nature (i.e., for investment) and do not involve consumer transactions (i.e., transactions entered into for personal, family or household purposes) under JAMS rules, or otherwise.

b.     **Additional Participants in this Agreement to Arbitrate.**     All shareholders, officers and directors of WORTH, and all employees, representatives, agents and affiliates of WORTH, past, present or future, are beneficiaries of, and participants in, this arbitration agreement. They will have the same rights and obligations under this arbitration agreement as the parties, to the extent that these arbitration agreement beneficiaries are named as respondents in any dispute, claim or controversy subject to or arising from this Agreement, or could have been so named.

c.     **Initiation of Arbitration.**     Any party may commence the arbitration process by filing a written demand for arbitration with the nearest JAMS office to Miami, Florida, with a copy to the other party(ies).

d.     **Arbitration Rules and Fees.**     Except as otherwise provided herein, the arbitration shall be conducted in accordance with the provisions of JAMS Comprehensive Arbitration Rules and Procedures in effect at the time of Borrower's execution of this Agreement (the "JAMS Rules"). The JAMS Rules shall apply

regardless of the amount of the claims or cross claims in the proceeding. Discovery may be taken by the parties only in the manner prescribed by the JAMS Rules. In the discretion of the arbitrator(s), pre-arbitration conferences and hearings may be telephonic.

You can find the JAMS Rules on JAMS' Internet web site: www.jamsadr.com. You can also obtain a copy of the JAMS Rules and information concerning JAMS' administrative and arbitrator fees by calling JAMS national toll free number at 800-352-5267. Currently, arbitrator fees range from about $350 to $600 per hour of service while some arbitrators charge a per diem fee. Hearings can be as short as one or two days, but could run five days or longer. Each side will also be charged an initial case management fee (currently $400).

You should review the JAMS rules, and pay attention to the arbitration fees which JAMS will charge the parties, as further discussed below in Section 35.i. You should also be aware that JAMS' fees change from time to time, and that JAMS' fee at the time of any dispute may be higher than at the time that you enter into this Agreement.

**e.**   **Arbitrators**.   The parties agree that a single arbitrator shall be selected to adjudicate all disputes unless otherwise provided for in this Agreement. The selection and replacement of an arbitrator or arbitrators shall be in accordance with the JAMS Rules, except that: (i) each arbitrator shall be a retired judge of either the Florida Circuit Court or a United States District Court located in Florida, and (ii) any party may require a panel of three neutral arbitrators.

**f.**   **Decision of the Arbitrator(s)**.   Subject only to a party's right to a JAMS appeal under Subsection 35.g below, the arbitration shall be final, conclusive and binding on the parties and the award of the arbitrator(s) shall be enforceable in any court of competent jurisdiction.

**g.**   **Right to Appeal**.   A final decision by one arbitrator may be appealed to JAMS by any party. A final decision by a three-arbitrator panel is final and may not be appealed. Appeals to JAMS shall be subject to the following rules and procedures:

1.   The appeal panel will consist of three neutral arbitrators selected in the same manner and subject to the same requirements as under Subsection 35.e. above.

2.   The procedure for filing and arguing an appeal is as follows:

(i)   Any party may appeal a final arbitration award issued by one arbitrator. The appeal must be served, in writing, on JAMS and on the opposing party within 14 calendar days after the award becomes final. The appealing party must specify in writing those parts of the award being appealed and must contain a brief statement of the appeal.

(ii)   Within seven calendar days of the service of the appeal, the opposing party may serve on JAMS and on the opposing party a cross-appeal from any part of the award. The written cross-appeal must specify those parts of the award that the party is cross appealing and must contain a brief statement of the basis for the cross-appeal.

(iii)   The record on appeal will consist of the stenographic or other record of the arbitration hearing and all exhibits, deposition transcripts and affidavits that the arbitrator has accepted into the record. The parties will cooperate with JAMS in compiling the appellate record. No evidence not previously accepted by the arbitrator will be considered by the appellate arbitrators, unless the basis of the appeal is non-acceptance by the arbitrator of certain evidence or unless the appellate arbitrators determine that there is good cause to re-open the record pursuant to the applicable JAMS arbitration rules.

(iv)   The parties may elect to rely on the memoranda or briefs previously submitted to the arbitrators. In the absence of such election, JAMS will obtain the agreement of the parties on a briefing schedule. If no agreement is reached, JAMS will set the briefing schedule. Ordinarily, according to JAMS rules, only opening briefs (of no more than 25 double-spaced pages) will be allowed. The briefs may be in the form of a letter.

(v)   The appellate arbitrators will hear oral argument if a party requests such argument. If there is to be oral argument, JAMS will obtain

the agreement of the parties on both the date of such argument and the duration, including the allocation of argument time between the parties. In the absence of agreement, the appellate arbitrators will set the date and duration of the oral argument, including the allocation of time.

3. Once a party has filed an appeal, JAMS will no longer consider the arbitration award final.

4. The appellate arbitrators will apply the same standard of review that the first level appellate court in the jurisdiction would apply to an appeal from the trial court decision, were the dispute being heard in state court instead of JAMS. The appellate arbitrators will respect the evidentiary standard set forth in Rule 22(d) of the JAMS Rules. The appellate arbitrators may affirm, reverse or modify an award.

The appellate arbitrators may not remand to the original arbitrator, but may re-open the record in order to review any evidence that had been improperly excluded by the arbitrator or any evidence that is now necessary in light of the appellate arbitrators' interpretation of the relevant substantive law. The appellate arbitrators, absent good cause for an extension, will issue the decision within 21 calendar days of the date of either oral argument, the receipt of the new evidence or receipt of the record and of all briefs, whichever is applicable or later. The appeal panel will make its decision by majority vote. The appellate arbitrators' decision will consist of a concise written explanation unless the parties all agree otherwise.

5. If a party refuses to participate in the appeal, the appellate arbitrators will maintain jurisdiction over the appeal and will consider the appeal as if all parties were participating, including retaining the authority to modify any award or element of an award that had previously been entered in favor of the non-participating party, assuming the arbitrators believe that the record, after application of the appropriate standard of appeal, justifies such action.

6. After the appellate arbitrators have rendered a decision, JAMS will issue the decision by serving copies on the parties. Service will be deemed effective five calendar days after deposit in the U.S. Mail. Upon service of the appellate decision, the award will be final for purposes of judicial review.

h. **Class Actions**. The parties agree that all matters related to a purported class action by

Borrower, including, but not limited to, issues of class representation, class certification, class notice and to a decision on the merits shall be determined in arbitration before JAMS pursuant to JAMS' Class Action Procedures then in effect, and by an arbitration panel of three arbitrators selected in accordance with the provisions of Subsection 35.e of this Agreement.

i. **Allocation of Costs**.

1. *Basic Arbitration Costs*. Each side (i.e., claimant(s) on the one hand and respondent(s) on the other) agrees that it will share equally in all JAMS administrative and arbitrator costs if only one arbitrator is used. You may petition the arbitrator to attribute all or a portion of your share of the administrative and arbitrator costs to WORTH, if you attest to and satisfactorily demonstrate that your financial means are insufficient to meet such costs.

If any party requires a three arbitrator, panel each side shall share equally in JAMS' administrative fees, but the party requiring the three arbitrator panel shall pay all arbitrator fees.

2. *Costs of Appeal*. The side appealing an arbitrator's award shall be responsible for all costs of the appeal, including the fees of the appellate arbitrators. If both sides appeal, all appellate costs shall be split equally between them.

3. *Class Actions*. Notwithstanding the foregoing, if Borrower brings a class action, the parties agree that each side will share equally all JAMS administrative and arbitrators' fees associated with such arbitration.

j. **Available Damages and Remedies**. The parties agree that the damages available to any party bringing an action under this Agreement shall be limited to any actual contract damages and tort damages incurred by the party and proximately caused by and resulting from the other party's alleged breach. This paragraph states the exclusive damage remedies available to the parties; and no party to this Agreement shall be entitled to any consequential, punitive or exemplary damages. In all matters, each party shall be

responsible for his, her or its own attorney's fees.

If any party unsuccessfully resists arbitration or enforcement of an arbitration award rendered under this Agreement, then all costs, attorneys' fees, and expenses incurred by the other party or parties in connection with any motions compelling arbitration or enforcing the award shall be fully assessed against and

paid by the unsuccessful party. Likewise, if the party resisting arbitration is successful, then the party moving to compel arbitration will pay all the successful resisting party's costs and attorney's fees incurred with respect to that motion only.

**k.** **Waiver of Litigation Rights and Jury Trial.** By signing this Agreement, each party to this Agreement is agreeing to have all claims, disputes and controversies arising out of, or relating to, Borrower's transactions with WORTH or to this Agreement decided by arbitration and is giving up any right to have such claims, controversies and disputes determined in a court of law by a judge or by a jury, except that court-ordered injunctive relief may be available as set forth above. By signing this Agreement, each party is similarly giving up his, her or its rights to appeal, unless expressly provided for herein. If any party refuses to abide by the terms of this Agreement, such party may be compelled to comply with its terms.

**l.** **Voluntary Agreement; Revocation.** Each party's agreement to arbitrate is voluntary. Borrower may revoke Borrower's agreement to arbitrate under Section 35 by written notice delivered to WORTH at 3900 Military Trail, Suite 600, Jupiter, Florida 33458 within 30 days of Borrower's first transaction with WORTH.

**36.** **Notification of Statement Errors:** If you think your account statement contains an error, or if you need more information about a transaction on your statement, write WORTH's Compliance Department, giving the following information: the amount of the suspected error, and a description of the error and an explanation of why you believe there is an error. If you need more information, describe the item you believe is erroneous. In order for you to preserve your rights, WORTH must hear from you in writing no later than ten (10) days after it sent you the first statement on which the error or problem appeared. WORTH will acknowledge your letter within 30 days, unless it has corrected the error by then. Within 90 days, WORTH will either correct the error or explain why it believes the statement is correct. You do not have to pay any amount in question while WORTH is investigating, but you are still obligated to pay the other parts of your statement that are not in question. While WORTH investigates your question, it will continue to charge your account for the amount in question, including finance charges, but it will not take action to collect the amount in question. If WORTH finds that it has made a mistake on your statement, you will not have to pay any interest charges relative to the questioned amount. If WORTH did not make a mistake, you are obligated to pay all amounts charged to your account when due.

**THE UNDERSIGNED AFFIRMS MY OR ITS UNDERSTANDING AND ACKNOWLEDGES THAT:**

**a.** I am of legal age and/or legally competent to enter into this Agreement.

**b.** All of my transactions with WORTH will be for investment or other commercial purposes and not for any personal, family or household purposes.

**c.** The purchase of precious metals, especially on credit, involves a high degree of risk and is not suitable for all persons. (See your account agreement with your retailer for further explanations of these risks.)

**d.** I will immediately notify WORTH's Compliance Department, in writing, if any statement made to me by a WORTH Representative is inconsistent with the risks and terms set forth in this Agreement or the Worth Account Agreement.

**e.** **There are numerous factors which affect precious metal prices and it is impossible to forecast accurately how or to what degree such factors will affect prices. I understand that I will lose money unless the value of the precious metals I purchase or borrow moves sufficiently in price to compensate me for commissions, bid/ask spreads, interest and any other applicable charges.** (See your account agreement with your retailer for further explanations of the calculation of your breakeven point.)

**f.** I have determined in my own mind that I am financially, intellectually and emotionally suitable to enter into the transactions which are the subject of this Agreement and able to accept the risks and to meet the financial commitments being made. (See your account agreement with your retailer for further explanations of these risks.)

**g.** I understand there are no assurances or guarantees by WORTH or its representatives as to the future value of the precious metals I am financing.

**h.** WORTH may monitor and electronically record any conversations between me or my agents and WORTH, its employees or agents.

**i.** Transactions subject to this Agreement are not subject to regulation by the Commodity Futures Trading Commission or the National Futures Association. WORTH is not a fiduciary and does not owe its borrowers any fiduciary duty.

**j.** Financing the ownership of precious metals makes it possible for me to lose substantially more than the amount of the payments or deposits I have made for those metals. Borrowing money to acquire or hold precious metals materially increases the risk of the investment. (See Sec. 3 and your account

agreement with your retailer for further explanations of these risks.)

k.  At times, I may be called upon to deposit substantial additional collateral with WORTH to secure my obligations to WORTH. It is possible for some or all of the Collateral in my account to be foreclosed upon without prior notice. (See Sec. 3.)

l.  WORTH will rely upon instructions and orders given by me over the telephone. It is the practice of the industry that such orders and instructions are binding.

m.  In times of highly volatile markets, WORTH phone lines may be busy due to the volume of calls. It is also possible for telephone lines to fail for reasons beyond WORTH's control. Because of this, I am advised and will be responsible to have alternative methods to communicate with WORTH (e.g., e-mail, courier messenger service, etc.) should it become necessary to do so. (See Sec. 3.)

n.  It is my responsibility to monitor my account and to stay in touch with WORTH concerning my account.  Do not wait to be contacted. (See Sec. 3.)

o.  Any representations that I will be notified or that my collateral will be liquidated, at particular price levels, are not authorized by WORTH and may not be relied upon by me. (See Secs. 3 and 13.)

p.  By signing this Agreement, the undersigned authorizes WORTH and its representatives to call me at any telephone number and to send me e-mails at any e-mail address that I have provided to WORTH, concerning matters regarding my WORTH account and for promotional purposes. Such authorization shall continue until such time as I notify WORTH in writing of its revocation or of a change in its terms.

q.  I must maintain equity in my account at or above the allowable minimum. I anticipate being called upon by WORTH to restore equity in my account. If I do not meet an equity call within the time required, WORTH may foreclose upon the collateral which I have pledged as security. (See Secs. 3, 13 and 14.)

r.  All risks of decline in the value of my precious metals held by the Bank are mine and not those of Bank or WORTH. (See Sec. 9.)

s.  WORTH and its employees are not your agents and owe no fiduciary duty to you.

t.  I am solely responsible for all transaction decisions for my account. Any reliance upon recommendations or suggestions by a WORTH representative or upon any written material in making my decision to enter into a transaction does not relieve me of my responsibility for that transaction and its outcome.

u.  If at any time the equity in my account falls below WORTH's minimum permissible level, WORTH has the right, but not the obligation, to foreclose upon my collateral without prior notice even if an equity call is in effect. (See Sec. 13.)

v.  I have carefully read and understand the foregoing. I understand that I am agreeing to submit all disputes, claims and controversies arising out of, or relating to, my transactions with WORTH or this Agreement to binding arbitration before JAMS, which is a private dispute resolution procedure, as set forth in Section 35 above. I understand that by agreeing thereto, I am also agreeing to pay JAMS administrative fees and arbitrators fees according to the terms of Subsection 35.d and to give up my rights to a jury trial of any claims. (See Section 35.k.)

| | |
|---|---|
| Paul Thompson | 08/31/2017 |
| *Customer Signature* | *Date* |
| | 08/31/2017 |
| *Co-Applicant Signature* | *Date* |

This document was electronically signed on 9/1/2017  1:30:05PM from IP Address: 68.104.12.105

AUTHORIZATION TO TRANSFER FUNDS

I hereby authorize WORTH GROUP, INC. to transfer excess funds that I hold in any account with it to any other account that I hold with it, without further authorization or notice necessary, to prevent or meet a call for additional collateral, or prevent a default, to pay for, collateralize or finance any cash purchase or borrowed commodity transaction that I have made, or to pay monthly service charges, delivery fees and handing costs in any of my accounts with those companies.

This authorization shall remain in effect until revoked or modified by the undersigned in writing.

| | |
|---|---|
| Paul Thompson | 08/31/2017 |
| *Customer Signature* | *Date* |

| | |
|---|---|
| | 08/31/2017 |
| *Co-Applicant Signature* | *Date* |

This document was electronically signed on 9/1/2017   1:30:05PM from IP Address: 68.104.12.105

Personal Information:                                **Individual Borrower Profile**

Borrower Name:    Paul Thompson                                Social Security No:    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

Borrower Name2:                                               Social Security No:    _-_-____

Residential Address:    10401 W. CHARLESTON BLVD. UNIT A-312
                        Street [P.O. Box *not* acceptable]

                        LAS VEGAS, NEVADA, 89135   UNITED STATES
                        City, State    Zip   Country

Check One:    →    ☒ U.S. Citizen        ☐ Non-Resident Alien        ☐ Resident Alien

Nationality:                                  Driver's License No., Passport or
                                             Alien I.D. Card:    1601604802;
Employer's Name:                                              Please provide photocopy or electronic scan of such I.D.

Position:

Business Telephone:    _-_-_          Years Employed:

Cell Phone:    _-_-_                  Home Telephone:    702-363-1311

Email:   pst3438@gmail.com            Fax Number:    _-_-_

Date of Birth:   03/24/1934           Co-Signer DOB:   _/_/____

Marital Status:


**Information for Corporations, Partnerships, Limited Liability Companies & Trusts:**

Name:                              State of Organization:

Address of Principal Place of Business:
                                   Street

                                   City, State    Zip   Country

   Names of Individual(s) with authority or control over the entity, including the entity:

   1.

   2.

   3.

I  hereby  warrant  that  the  foregoing  answers  are  true  and  correct  to  the  best  of  my  knowledge  and  that  I  have  not been  instructed  by  anyone  to  misrepresent  any  fact  herein.     WORTH  GROUP,  INC.  may  rely  on  the  above  information in determining whether to extend me credit.


   Paul Thompson                              Date:    08/31/2017
Signature


                                              Date:    08/31/2017
Signature


                                This document was electronically signed on 9/1/2017  1:30:05PM from IP Address: 68.104.12.105

**WORTH GROUP, INC.**

**INSTRUCTION LETTER AND ACCOUNT ADDENDUM**

Dear Customer:

As you know, you maintain an account with Worth Group, Inc. ("Worth Group") or one or more retail brokers through which you may, from time to time, purchase gold, silver, platinum and other precious metals.  Worth Group may have in the past and may in the future extend loans (each a "Loan") to you in connection with such purchases and either has sold or may sell those loans from time to time to one or more third parties under the terms of your applicable brokerage agreements.

In the event that Worth Group has sold or in the future sells a Loan to Collateral Finance Corporation ("CFC"), your metal serving as collateral (the "Collateral") for the Loan has been or will be transferred from the possession of Worth Group to the possession of Transcontinental Depository Services, LLC ("TDS") for CFC's benefit, in order to maintain the perfection of CFC's security interest in the Collateral (the "Security Interest"), although you at all times retain title to the Collateral pursuant to the terms of your account documentation.  If Collateral is transferred to the possession of TDS as described above, you hereby designate TDS to act as your depositary in accordance with your account documentation and TDS will hold the Collateral in your name, subject to CFC's right to possess the Collateral for purposes of perfecting and enforcing its Security Interest.  Once your Loan has been repaid in full, or if the Security Interest in a portion of the Collateral is released by CFC (in its sole and absolute discretion) for any other reason as a result of a request by Worth Group on your behalf (which you hereby authorize) ( a "Release of Collateral"), such Collateral will be returned to you. By signing and returning a copy of this letter, you hereby instruct CFC, upon a Release of Collateral, to implement such return of Collateral by authorizing TDS to transfer such Collateral to Worth Group for deposit into your account.  This will allow you to continue to make trades through Worth Group until you choose to close your account.  Because you retain title to the Collateral, you may contact CFC at any time prior to a Release of Collateral and instruct CFC to return Collateral to you in any other manner permitted by law.
Please note that you will retain title to the Collateral at all times regardless of whether the Collateral is maintained at Worth Group or with TDS for CFC's benefit.

By acknowledging and returning a copy of this letter, you hereby confirm notice of the foregoing and instruct TDS to (a) act as your depository while CFC holds Loans, subject to CFC's rights as a secured party, and (b) return any Collateral to your account at Worth Group upon a Release of Collateral.  You further authorize Worth Group to provide this letter to CFC and TDS as evidence of your instruction and agree that neither TDS, nor CFC shall be liable to you for complying with and relying on your instruction unless it is revoked by you, in writing and received by TDS prior to a Release of Collateral.  As noted above, you may revoke this instruction with respect to a Release of Collateral at any time prior to a Release of Collateral by providing written notice to Worth Group and CFC.

Thank you for your business, and let me know if you have any questions or comments.


ACKNOWLEDGED AND AGREED:


| Paul Thompson | | 09/01/2017 |
| --- | --- | --- |
| Signature | | Date |


| _____ | | _____ |
| --- | --- | --- |
| Signature | | Date |

This document was electronically signed on 9/1/2017  1:30:05PM from IP Address: 68.104.12.105

# ADDITIONAL INFORMATION

**AML POLICY:**   To comply with Federal ANTI MONEY LAUNDERING laws, we ask that you provide us at the time you open your account with a current government-issued photo-bearing identification with current residential address (e.g., driver's license, passport, state or national identity card).   If you are a corporation, partnership, limited liability company or trust, we ask that you provide us with a certified copy of your articles or certificate of incorporation or organization or partnership or trust agreement, as appropriate, and a certificate of good standing or active status issued by the jurisdiction of formation or incorporation.   We also ask that you complete the attached one page form.

**PRIVACY POLICY:**   Maintaining the privacy of your personal information is of the utmost importance to us. In order to provide services to you, we must maintain certain information that we collect from account applications or other forms that you complete, transactions that you conduct and communications with our affiliates and us.   It is our policy not to disclose your personal information to third parties except as permitted by law or requested by you.   We also restrict access to nonpublic personal information to those employees who need to know that information to provide service to you.   You are welcome to contact us at 1-866-705-4150 if you have any questions regarding our Privacy Policy.   We reserve the right to revise our policy and will provide you notice of any revisions.

**SENDING FUNDS TO WORTH:**

Make checks or wires payable to **<u>WORTH</u>** to respond to calls for additional equity or to pay off the balance due on a Loan.   Be sure to reference your account number and the name of the borrower on the back of the check or in the wire.

<u>**Wire to**</u>:

Please contact WORTH directly for wiring instructions.

<u>Mail to</u>:

Worth Group, Inc.
3900 Military Trail, Suite 500
Jupiter, Florida  33458

### If you have any questions please contact us at 1-866-705-4150

**Any deletions from, additions to or cutting or mutilation of any portion of this Agreement will render the Agreement unacceptable.**

Exhibit 11



